IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2013-NMSC-003

Filing Date: January 17, 2013

Docket No. 32,898

STATE OF NEW MEXICO,

        Plaintiff-Appellee,

v.

ARNOLDO NAVARETTE,

        Defendant-Appellant.

ORIGINAL PROCEEDING
Teddy L. Hartley, District Judge

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Margaret E. McLean, Assistant Attorney General
Daniel F. Haft, Assistant Attorney General
Olga Serafimova, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

CHÁVEZ, Justice.

{1}    The main question in this case is whether *Crawford v. Washington*, 541 U.S. 36 (2004) and its progeny preclude a forensic pathologist from relating subjective observations recorded in an autopsy report as a basis for the pathologist's trial opinions, when the pathologist neither participated in nor observed the autopsy performed on the decedent. We answer this question affirmatively and conclude that there was a Confrontation Clause

1

violation because (1) the autopsy report contained statements that were made with the primary intention of establishing facts that the declarant understood might be used in a criminal prosecution, (2) the statements in the autopsy report were related to the jury as the basis for the pathologist's opinions and were therefore offered to prove the truth of the matters asserted, and (3) the pathologist who recorded her subjective observations in the report did not testify at trial and Defendant Arnoldo Navarette did not have a prior opportunity to cross-examine her. We therefore reverse and remand for a new trial. The remaining issues raised by Navarette are without merit.

**BACKGROUND**

{2}    Navarette was tried and convicted as a principal for the first-degree murder of Reynaldo Ornelas and aggravated battery with a deadly weapon for the non-fatal shooting of Reynaldo's brother, Daniel Ornelas. The Ornelas brothers were shot while leaning into the open driver's side window of a parked car driven by Dolores "Lolo" Ortega, in which Navarette was the front-seat passenger. Navarette's defense was that the driver was the shooter. Daniel testified that Navarette shot him and his brother. However, the first police officer who interviewed Daniel about the shooting testified that Daniel said that he did not know who shot him. Only two other witnesses testified that they saw who shot the Ornelas brothers.[1] Diane Ornelas testified that Navarette was the shooter. Miguel Montoya testified that Lolo, the driver, was the shooter.

{3}    Presumably to assist the jury in assessing who shot the victims, the State called Dr. Ross Zumwalt, the Chief Medical Investigator for the State of New Mexico, to testify about the cause and manner of Reynaldo's death; whether the entry and exit wounds could explain Reynaldo's position at the time he was shot; and whether Dr. Zumwalt had an opinion, based on the observations recorded in the autopsy report, as to whether the gun was fired from within two feet of the victim. Dr. Zumwalt testified that Dr. Mary Dudley, who at the time of trial was the Chief Medical Investigator in Kansas City, Missouri, performed the autopsy on Reynaldo. The autopsy was performed as part of a homicide investigation and two of the investigating officers attended the autopsy. Dr. Zumwalt neither participated nor observed Dr. Dudley perform the autopsy, yet he testified that Dr. Dudley followed the standard procedure for performing autopsies.

{4}    Navarette objected to both Dr. Zumwalt's testimony and Dr. Zumwalt's reliance on the autopsy report, asserting his Sixth Amendment right to confront witnesses against him. After hearing preliminary testimony from Dr. Zumwalt and listening to oral argument, the

---

[1]Rosemary Ortega, Lolo's sister, testified at Navarette's trial that she could not recall specific events from the day of the shooting. The State impeached Ortega and presented her with her testimony from Lolo's trial. However, she still could not remember anything and the prosecution was allowed to read her testimony from Lolo's trial. At that trial, she testified that she saw Navarette with the gun in his hand.

trial court asked the State whether Dr. Zumwalt's testimony was necessary. Based in part on the representation that his testimony was necessary, the trial court overruled Navarette's objection, and Dr. Zumwalt was permitted to testify before the jury and to rely on the contents of the autopsy report in expressing his opinions.

{5}     The State referred Dr. Zumwalt to the contents of the autopsy report throughout his direct examination. The autopsy report itself was never offered into evidence. Photographs of the decedent showing entry and exit wounds were admitted without objection, as were figure diagrams illustrating the location of the entry and exit wounds. Based on the photographs and the contents of the autopsy report describing Reynaldo's injuries, Dr. Zumwalt testified that Reynaldo died rapidly from internal bleeding resulting from a single gunshot wound. This opinion was corroborated by eyewitnesses, each of whom testified that they heard gunshots, saw Reynaldo take a few steps backward, and collapse dead shortly after being shot.

{6}     The disputed issue was who shot Reynaldo—the driver, who was closest to Reynaldo, or Navarette, who was several feet away from Reynaldo. Relevant to this disputed issue, Dr. Zumwalt testified that based on the entry and exit wounds, Reynaldo could have been leaning into the window at the time he was shot. Perhaps more important was Dr. Zumwalt's testimony regarding the absence of soot or stippling. He testified that the standard procedure is for a pathologist to look for soot or stippling on the decedent's clothing or body. He further testified that evidence of soot, stippling, and gunpowder is not always clear to the naked eye, and therefore analysts often need to "use a magnifying scope to look for [evidence of gunpowder or powder flakes]." He also testified that at times a decedent's clothing is preserved and sent to a crime lab for closer analysis regarding the presence of soot or stippling. Through his testimony, Dr. Zumwalt suggested that at the time the gun was fired, the gun was not within two feet of Reynaldo because the autopsy report states that no evidence of soot or stippling was found on Reynaldo's body or clothing. During cross-examination Dr. Zumwalt again repeated Dr. Dudley's assertion in the report that this was a distant range shooting, because Dr. Dudley did not see any evidence of a close range shooting. The prosecution emphasized Dr. Zumwalt's testimony in his closing argument to the jury, explaining that based on the expert testimony, the shooter could not have been the driver. It is against this factual backdrop that we analyze Navarette's Confrontation Clause objection.

**DISCUSSION**

**The Validity of Navarette's Confrontation Clause Objection Depends on Whether Dr. Zumwalt Related Testimonial Statements Made by Dr. Dudley**

{7}     Our examination of *Crawford* and its progeny reveals that at least five justices of the United States Supreme Court have agreed upon the following principles that we conclude are essential to a Sixth Amendment Confrontation Clause analysis. *Crawford*, 541 U.S. at 36; U.S. Const. amend. VI. The first principle relevant to this case is that an out-of-court

3

statement that is both testimonial and offered to prove the truth of the matter asserted may not be admitted unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54 ("[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."). What constitutes a testimonial statement is not easily discernable from a review of *Crawford* and its progeny. In *Crawford*, the United States Supreme Court described "testimonial" statements as "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." *Id.* at 51 (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). The *Crawford* majority also set forth the following non-exhaustive list of "core class of 'testimonial' statements":

> [*E*]*x parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[;] [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotation marks and citations omitted).

**{8}**     Since *Crawford*, a majority of the United States Supreme Court has mainly focused on the primary purpose for which the statement was made. "[Statements] are testimonial when . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

> We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence. *Davis,* 547 U.S., at 822, 126 S.Ct. 2266; see also *Bullcoming* [*v. New Mexico*], 564 U.S. [___], at ——, 131 S.Ct. [2705], at 2716-2717 [(2011)]; [*Michigan v.*] *Bryant*, 562 U.S., at ——, ——, 131 S.Ct. [1143], at 1157, 1165 [(2011)]; *Melendez-Diaz* [*v. Massachusetts*], 557 U.S. [305], at 310-311, 129 S.Ct. 2527[, at 2532 (2009)]; *Crawford,* 541 U.S., at 51-52, 124 S.Ct. [at] 1354.

*Williams v. Illinois*, ___ U.S. ___, ___, 132 S. Ct. 2221, 2273-74 (2012) (Kagan, J., dissenting, joined by Scalia, Ginsburg, and Sotomayor, JJ.). Justice Thomas agrees with the primary purpose analysis, although he would also require the statement to be solemn or formal, akin to an affidavit.

4

The original formulation of that test asked whether the primary purpose of an extrajudicial statement was to establish or prove past events potentially relevant to later criminal prosecution. I agree that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution.

*Id.* at ___, 132 S. Ct. at 2261 (Thomas, J., concurring in the judgment) (internal quotation marks and citation omitted). Therefore, we conclude that the second principle, with which at least five justices agree, is that a statement can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution.

**{9}**    The third principle is that when determining whether an out-of-court statement is testimonial, there is no meaningful distinction between factual observations and conclusions requiring skill and judgment. This principle was articulated by the majority in *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705 (2011):

> The New Mexico Supreme Court held surrogate testimony adequate to satisfy the Confrontation Clause in this case because analyst Caylor "simply transcribed the resul[t] generated by the gas chromatograph machine," presenting no interpretation and exercising no independent judgment.
>
> . . . .
>
> Most witnesses . . . testify to their observations of factual conditions or events, *e.g.*, "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically "No."

*Id.* at ___, 131 S. Ct. at 2714-15.

**{10}**    The fourth principle is that even if a statement (in this case, a forensic report), does not target a specific individual, the statement may still be testimonial. In *Williams*, four justices concluded that a forensic report was not testimonial because the report did not target a specific individual. *Id.* at ___, 132 S. Ct. at 2243 (plurality opinion). Justice Thomas rejected this approach in his concurring opinion, stating "The new primary purpose test [from the *Williams* plurality opinion] asks whether an out-of-court statement has the primary

5

purpose of accusing a targeted individual of engaging in criminal conduct. That test lacks any grounding in constitutional text, in history, or in logic." *Id.* at ___, 132 S. Ct. at 2262 (Thomas, J., concurring in the judgment) (internal quotation marks and citation omitted). Writing for four justices who dissented in *Williams*, Justice Kagan also rejected this approach, stating:

> [T]he plurality states that the Cellmark report was not prepared for the primary purpose of accusing a targeted individual. Where that test comes from is anyone's guess. Justice THOMAS rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. And it has no basis in our precedents.

*Id.* at ___, 132 S. Ct. at 2273 (Kagan, J., dissenting, joined by Scalia, Ginsburg, and Sotomayor, JJ.) (internal quotation marks and citations omitted).

**{11}** The fifth principle is that the fact that an out-of-court statement (in this case, the forensic report) is not inherently inculpatory does not make it non-testimonial. Again, four justices in *Williams* held that a report which is not inherently inculpatory is not testimonial. *Id.* at ___, 132 S. Ct. at 2243-44 (plurality opinion). Justice Thomas rejected this conclusion, stating that "the distinction between those who make 'inherently inculpatory' statements and those who make other statements that are merely 'helpful to the prosecution' has no foundation in the text of the [Sixth] Amendment." *Id.* at ___, 132 S. Ct. at 2263 (Thomas, J., concurring in the judgment). Justice Kagan, writing for four justices, also rejected this notion, stating that the plurality could not "gain any purchase from the idea that a DNA profile is not inherently inculpatory." *Id.* at ___ n.5, 132 S. Ct. at 2274 n.5 (Kagan, J., dissenting, joined by Scalia, Ginsburg, and Sotomayor, JJ.) (internal quotation marks and citation omitted).

**{12}** The sixth principle is that the Confrontation Clause is violated only if the testimonial statement is offered to prove the truth of the matters asserted. *Crawford*, 541 U.S. at 59-60 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 411-12, 414 (1985) (where the defendant testified that police had read accomplice's confession to him and forced him to repeat it, admission of accomplice's confession was proper so that the jury could see how the confessions differed)); *accord State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110.

**{13}** The seventh and final principle that we have identified as relevant to the inquiry in this case is that an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted. Therefore, the declarant must testify at trial and be subject to cross-examination, or alternatively must be unavailable, and the defendant must have had a prior opportunity to cross-examine the declarant. This principle is also derived from *Williams*. Four justices concluded that an out-of-court statement that supports an expert witness's opinion is not offered to prove the truth of the matter asserted, but is only offered as the basis for the expert's opinion. *Williams*, ___ U.S.

at \_\_\_, 132 S. Ct. at 2239-40 (plurality opinion). The four justices did, however, acknowledge that the basis must otherwise be established during the trial, or the expert's opinion that depends on the basis is not entitled to any weight. *Id.* at \_\_\_, 132 S. Ct. at 2241.

**{14}** Justice Thomas disagreed that statements which form the basis of an expert's opinion are not introduced to prove the truth of the statements. "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible non-hearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Id.* at \_\_\_, 132 S. Ct. at 2257 (Thomas, J., concurring in the judgment). Justice Kagan, writing for the balance of the Court, was more to the point.

> [W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion, . . . the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such "basis evidence" comes in not for its truth, but only to help the factfinder evaluate an expert's opinion "very weak," "factually implausible," "nonsense," and "sheer fiction."

*Id.* at \_\_\_, 132 S. Ct. at 2268-69 (Kagan, J., dissenting, joined by Scalia, Ginsburg, and Sotomayor, JJ.).

**{15}** Applying these principles, we must answer whether the statements in the autopsy report that formed the basis of Dr. Zumwalt's testimony were testimonial. Our Court of Appeals has held that an autopsy report admitted into evidence in a homicide trial was testimonial hearsay under the Confrontation Clause. *State v. Jaramillo*, 2012-NMCA-029, ¶ 16, 272 P.3d 682. In *Jaramillo*, the court held that the autopsy report was testimonial because it contained findings and conclusions including "an exercise of judgment and analysis . . . as [the medical examiner] formed opinions based on his medical training and as he interpreted factual findings." *Id.* ¶ 9. The Court of Appeals also justified its holding by explaining that:

> The medical examiner's finding of homicide was critical to substantiate allegations that Defendant abused [the victim] and caused his death. Therefore, the autopsy report was prepared with the purpose of preserving evidence for criminal litigation. In this case, the face of the autopsy report itself states that an autopsy was requested because of "the circumstances" of [the victim's] death, being a severe brain injury of a sort commonly associated with trauma. By the time the medical examiner had determined the cause of death to be closed head injuries and the manner of death to be homicide, there was no doubt this would be used against someone in a

7

criminal prosecution. NMSA 1978, Section 24-11-7 (1973) requires an autopsy with complete findings when a "medical investigator suspects a death was caused by a criminal act or omission or the cause of death is obscure[.]"

*Jaramillo*, 2012-NMCA-029, ¶ 10.

**{16}** In this case, Dr. Zumwalt acknowledged that the autopsy on Reynaldo was performed as part of a homicide investigation. In fact, two police officers attended the autopsy. It is axiomatic that Dr. Dudley made the statements in the autopsy report primarily intending to establish some facts or opinions with the understanding that they may be used in a criminal prosecution. As the *Jaramillo* court noted:

> [I]n New Mexico, any sudden, violent, or untimely death, the cause of which is unknown, must be reported to law enforcement. NMSA 1978, § 24-11-5 (1975). Medical examiners are obligated by statute to report their findings directly to the district attorney in all cases they have investigated. NMSA 1978, § 24-11-8 (1973). This forensic role is entirely in keeping with the medical examiner's purpose to "serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses."

*Id.* ¶ 13 (quoting *Strengthening Forensic Science in the United States: A Path Forward* 244 (Nat'l Research Council of the Nat'l Acads. 2009)). These same statutory sections, NMSA 1978, §§ 24-11-5 (1975), -7 (1973), and -8 (1973), would apply here because this case involved a violent death by shooting in New Mexico, which would ordinarily raise suspicion that the death was caused by a criminal act. A medical examiner obligated to report her findings to the district attorney should know that her statements may be used in future criminal litigation. As the *Jaramillo* court observed:

> There is no reason to suspect that a pathologist with considerable experience and knowledge of statutory duties to report suspicious deaths to law enforcement officers would not anticipate criminal litigation to result from his determination that the trauma-related death of a child was the result of homicide. . . . [R]uling the death a homicide reflects directly on the issue of a defendant's guilt or innocence. No question existed that the report would support and be used in a criminal prosecution.

*Id.* ¶ 11.

**{17}** Similarly, there is no reason that Dr. Dudley, aware of her statutory duties to report, should not have anticipated that criminal litigation would result from her autopsy findings of death by a bullet wound and her findings regarding soot, stippling, and gunpowder. As Dr. Zumwalt explained, the Office of the Medical Investigator's primary duties "are to

8

examine those individuals in New Mexico who die suddenly and unexpectedly or who die of an injury in order to determine the cause of death . . . and give an opinion as to the manner of death . . . ." Thus, these statutory sections apply as a general matter to cases within the Office of the Medical Investigator. Because Dr. Zumwalt conceded that it was immediately clear that this autopsy was part of a homicide investigation, the observations in *Jaramillo* apply with equal force here. As in *Jaramillo*, the medical examiner's findings as to the cause of death and as to soot, stippling, and gunpowder all went to the issues of whether Reynaldo's death was a homicide and, if so, who shot him. These issues reflected directly on Navarette's guilt or innocence. Thus, as in *Jaramillo*, these statements are testimonial.

**{18}** Moreover, our conclusion is bolstered by *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2705. The *Bullcoming* majority made clear that "[a] document created solely for an 'evidentiary purpose' . . . made in aid of a police investigation, ranks as testimonial." *Id.* at 2717. Because an autopsy conducted in the context of a death caused by this type of injury will automatically trigger a duty by medical examiners to report their findings to the district attorney, *see* § 24-11-8, we conclude that autopsy reports regarding individuals who suffered a violent death are testimonial. As indicated by the fourth and fifth principles, it does not matter that the autopsy report does not target a specific person or that the autopsy report does not produce inherently inculpatory evidence. *See* discussion, ¶¶ 10-11, *supra*. The observations, findings, and opinions within the report are statements that were made when the pathologist understood that the statements might be used in a criminal prosecution.

**{19}** However, the Court of Appeals in *Jaramillo* carefully emphasized that it was the admission of the autopsy report itself that violated the Confrontation Clause. *See Jaramillo*, 2012-NMCA-029, ¶¶ 6-14. The court noted that "[b]ecause admission of the autopsy report alone constituted prejudicial error mandating reversal, we need not address Defendant's argument regarding Dr. Parsons' [reference to the report]." *Id.* ¶ 6. In this case, the autopsy report was not admitted into evidence. Thus, the issue here is whether an expert can relate out-of-court statements to the jury that provide the basis for his or her opinion, as long as the written statements themselves are not introduced. This question was answered by the United States Supreme Court in *Williams*. We note that the *Jaramillo* opinion was issued on November 23, 2011, and *Williams* was not decided until June 18, 2012. Therefore, the Court of Appeals did not have the benefit of the fractured *Williams* opinion at the time it wrote *Jaramillo*. However, prescient of how a majority of the United States Supreme Court might rule on the issue, the Court of Appeals held that the autopsy report in *Jaramillo* could not be introduced even under Rule 11-703 NMRA, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference

unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.[2]

(quoted in *Jaramillo*, 2012-NMCA-029, ¶ 18 (internal quotation marks omitted)).

**{20}** Although our evidentiary rule permits the disclosure of inadmissible evidence if a court specifically determines that the probative value of the inadmissible evidence in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect, a majority of the United States Supreme Court rejects this approach. In *Williams*, Justice Thomas addressed this issue by stating:

> Of course, some courts may determine that hearsay of this sort is not substantially more probative than prejudicial and therefore should not be disclosed under Rule 703. But that balancing test is no substitute for a constitutional provision that has already struck the balance in favor of the accused. *See Crawford*, 541 U.S., at 61, 124 S.Ct. 1354 ("[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination").

*Williams*, ___ U.S. at ___, 132 S. Ct. at 2259 (Thomas, J., concurring in the judgment). Writing for four justices, Justice Kagan rejected the approach as a subterfuge.

> Imagine for a moment a poorly trained, incompetent, or dishonest laboratory analyst. (The analyst in *Bullcoming*, placed on unpaid leave for unknown reasons, might qualify.) Under our precedents, the prosecutor cannot avoid exposing that analyst to cross-examination simply by introducing his report. Nor can the prosecutor escape that fate by offering the results through the testimony of another analyst from the laboratory. But under the plurality's approach, the prosecutor could choose the analyst-witness of his dreams (as the judge here said, "the best DNA witness I have ever heard"), offer her as an expert (she knows nothing about the test, but boasts impressive degrees), and have her provide testimony identical to the best the actual tester might have given ("the DNA extracted from the vaginal swabs matched Sandy Williams's")—all so long as a state evidence rule says that the purpose of the testimony is to enable the factfinder to assess the expert opinion's basis. (And this tactic would not be confined to cases involving scientific evidence. As Justice THOMAS points out, the prosecutor could similarly substitute experts for all kinds of people making out-of-court statements.) The plurality

---

[2]Effective June 16, 2012, the language of Rule 11-703 has been amended to be consistent with the restyled Federal Rules of Evidence. The changes are stylistic and have no effect on the substance of the rule. Rule 11-703 cmt.

thus would countenance the Constitution's circumvention. If the Confrontation Clause prevents the State from getting its evidence in through the front door, then the State could sneak it in through the back. What a neat trick—but really, what a way to run a criminal justice system. No wonder five Justices reject it.

*Id.* at ___, 132 S. Ct. at 2272 (Kagan, J., dissenting, joined by Scalia, Ginsburg, and Sotomayor, JJ.).

**{21}** The record in this case does not reveal that the trial court was ever asked to perform the Rule 11-703 balancing test. Given the viewpoint of a majority of the United States Supreme Court, the Confrontation Clause analysis makes any Rule 11-703 analysis irrelevant in this case. Additionally, in this case, the importance of a bright-line constitutional rule that requires the out-of-court declarant to be subjected to cross-examination is readily apparent. Dr. Zumwalt testified that evidence of soot, stippling, or gunpowder cannot always be easily seen by the naked eye and often ends up on the clothing, rather than the skin, and therefore autopsy photographs of the body would not necessarily capture such evidence. Consequently, in material respects, the autopsy findings do not involve objective markers that any third party can examine in order to express an independent opinion as to the existence or non-existence of soot or stippling. Such observations are not based on any scientific technique that produces raw data, but depend entirely on the subjective interpretation of the observer, who in this case was Dr. Dudley. How Dr. Dudley reached the conclusion that there was no evidence of soot or stippling on Reynaldo's body or clothing should have been the subject of cross-examination. Inquiry into her training, the equipment used to arrive at her subjective conclusion, whether the evidence of soot or stippling might have been masked by blood, or any other variables that would influence her decision should have been tested in the crucible of cross-examination. "[T]he analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2715 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 n.6 (2009)).

**{22}** This is not to say that all material contained within an autopsy file is testimonial and therefore inadmissible. Without attempting to catalogue all material in a file that could be admissible, we note that an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause. *See Aragon*, 2010-NMSC-008, ¶¶ 26-30 (confrontation case framing the question presented as whether the testifying analyst was testifying to his own opinion or merely parroting the opinion of the analyst who performed the forensic analysis and noting that the testifying analyst had not analyzed the raw data to reach his conclusion). For example, in this case, after being shown the autopsy photographs, Dr. Zumwalt expressed his own opinion about the entry and exit wounds, explaining the basis for his opinion. He did not simply parrot the opinion or subjective statement of the pathologist who performed the autopsy and took the photographs. Thus, he was available for cross-examination.

11

**{23}** Because Dr. Zumwalt related testimonial hearsay from Dr. Dudley to the jury, and it was not established that Dr. Dudley was unavailable and Navarette had a prior opportunity to cross-examine Dr. Dudley, Navarette's confrontation rights were violated. We therefore reverse his convictions and remand for a new trial consistent with this opinion.

**Navarette's Remaining Issues Are Without Merit**

**{24}** Pursuant to *State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967) and *State v. Boyer*, 103 N.M. 655, 658, 715 P.2d 1, 4 (Ct. App. 1985), Navarette contends that the trial court abused its discretion by admitting the testimony of Ricky Ornelas, a witness to the crime, who testified that Navarette had threatened Ricky with a pistol several months before the shooting. The State had served notice of its intention to introduce the evidence before trial pursuant to Rule 11-403 NMRA. After hearing argument of counsel during a pretrial hearing, the trial court reserved ruling on the issue until the evidence was offered at trial. At the time that the testimony was offered, Navarette did not object to the testimony. Because we reverse and remand for a new trial, we do not need to address this issue.

**{25}** Navarette also argues that the trial court erred in failing to quash the indictment because he received a target letter describing the charges against him written in English and he speaks only limited English. He raises this challenge pursuant to Article II, Section 14 of the New Mexico Constitution, which guarantees a defendant the right "to have [criminal] charge[s] and testimony interpreted to him in a language that he understands . . . ." To support a motion to quash an indictment based on improper notice, the defendant must demonstrate prejudice. *State v. Haynes*, 2000-NMCA-060, ¶ 25, 129 N.M. 304, 6 P.3d 1026. Navarette has not asserted that he was prejudiced, much less demonstrated any prejudice. The evidence before the trial court was that Navarette had been interviewed by police officers for over one hour in English and had also answered all of the arraigning judge's questions in English. We therefore conclude that the trial court did not err in denying Navarette's motion to quash the indictment.

**{26}** Finally, Navarette argues under *Franklin* and *Boyer* that he was deprived of the right to present witnesses in his defense under the Sixth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution. *Franklin*, 78 N.M. at 129, 428 P.2d at 984; *Boyer*, 103 N.M. at 658, 715 P.2d at 4. Article II, Section 14 of the New Mexico Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right . . . to have compulsory process to compel the attendance of necessary witnesses in his behalf . . . ." Similarly, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI.

**{27}** As the source of the violation, Navarette asserts that he was not able to call Officer Ted Shoemaker as a witness because Officer Shoemaker was ill and unable to testify. Despite his protests, Navarette and the State stipulated to the substance of Officer Shoemaker's testimony or rather, the testimony he would have given had he been able to

testify, and the substance of that stipulation was presented to the jury. The parties stipulated that Officer Shoemaker was near the scene at the time of the shooting, that he heard four gunshots before being dispatched to the scene, and that he was the second officer to arrive on the scene.  Therefore, Navarette has no reason to complain.  In any event, this case is remanded for a new trial, in which case Navarette may consider whether to call Officer Shoemaker as a witness.

**CONCLUSION**

**{28}**    Because the forensic pathologist related testimonial hearsay to the jury in support of his opinions, Navarette's confrontation rights were violated.  We reverse his convictions and remand for a new trial.

**{29}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for _State v. Navarette_, No. 32,898**

**APPEAL AND ERROR**
Remand

**CONSTITUTIONAL LAW**
Confrontation
Right to Confrontation

**CRIMINAL PROCEDURE**
Expert Witness

13

Right to Confrontation
Witnesses

**EVIDENCE**
Expert Witness
Hearsay Evidence
Physical Evidence