The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 29, 2023

**No. A-1-CA-39585**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellant,

v.

**ERIK LEA,**

     Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Courtney Weaks, District Court Judge**

Raúl Torrez, Attorney General
Laurie Blevins, Assistant Attorney General
Santa Fe, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Mark A. Perlata-Silva, Assistant Appellate Defender
Albuquerque, NM

for Appellee

**OPINION**

**HANISEE, Judge.**

{1}    In this interlocutory appeal, the State challenges the district court's grant of a motion to suppress DNA evidence collected by a sexual assault nurse examiner (SANE) who passed away between the time of examination and testing. We first addressed this topic, regarding the same deceased SANE, in *State v. Carmona*, 2016-NMCA-050, ¶ 13, 371 P.3d 1056, *cert. denied*, S-1-SC-35851 (N.M. May, 11, 2016), in which, guided by our New Mexico Supreme Court's holding in *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435, this Court held that "the Confrontation Clause prohibits the admission of DNA evidence collected by an unavailable SANE and any expert testimony based thereon when the primary purpose animating the SANE's collection of such evidence is to assist in the prosecution of an individual *identified at the time of the collection*." *Carmona*, 2016-NMCA-050, ¶ 13, 371 P.3d 1056 (emphasis added). Applying *Carmona*, the district court suppressed the DNA evidence on Confrontation Clause grounds. The State appeals, arguing that *Carmona* does not control this case because the perpetrator was *unknown* at the time of the SANE exam. The State further contends the evidence was gathered during an ongoing emergency and thus excluded from the right of confrontation. Still guided primarily by *Navarette*, we hold there to be no constitutional distinction between the contemporaneous statements made by a SANE nurse collecting DNA evidence from

an assault victim of an unidentified rapist versus those made when the rapist's identity is known. As such, the right to confront applies to those statements. Concluding as well that the evidence gathered herein reflects the product of investigative steps and not the sort of law enforcement action that our jurisprudence characterizes to be the product of an ongoing emergency, we affirm.

**BACKGROUND**

{2}     Defendant was indicted on one count of kidnapping and two counts of criminal sexual penetration against M.F. (Victim). The State alleges that in June 2006, Victim was attempting to get into her car when a man that she did not know pushed her in and got into the back seat of the vehicle. The unknown man forced her to drive to a more secluded location, then sodomized her. Although the man threated to kill Victim if she went to the police, she quickly reported the attack and underwent a SANE examination at the Albuquerque SANE Collaborative. A rape kit was collected during the exam, including swabs potentially containing DNA material from the rapist. The rape kit was processed in 2017—eleven years after the attack— and identified Defendant as the DNA match for the unknown rapist. During the intervening decade, the SANE nurse that conducted the examination, Lydia Vandiver, died.

{3}     Upon indictment, the State asked the district court for a pretrial ruling on the use of SANE Vandiver's statements in the test kit, which included Vandiver's

affirmative statements on the packaging that the contents were collected from Victim shortly after the assault. The State concedes that SANE Vandiver's act of placing the swabs in a labeled collection bag constituted her affirmative statement for purposes of hearsay. *See* Rule 11-801(A) NMRA (defining a hearsay statement as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion"). The State argued, however, that neither the United States Constitution's Confrontation Clause nor our decision in *Carmona* precluded admission of SANE Vandiver's hearsay statements in this instance. *See* U.S. Const. amend. VI; *Carmona*, 2016-NMCA-050.

{4}     The district court held a hearing on the motion, where the State called as a witness the former executive director of the Albuquerque SANE Cooperative. She was the executive director during the time of Victim's exam in 2006, though she did not participate in the exam itself. The executive director testified that her duties included transferring "evidence that the nurses collected to the Albuquerque Police Department Crime Lab." Once collected, the executive director described how materials collected during exams were stored in locked "evidence lockers." With the materials from Victim's exam, the executive director described SANE Vandiver's signature on the "chain of custody." Both the prosecutor and the executive director referred to the documentation on bags of collected material as an "evidence tag."

{5}     The district court denied the State's motion, suppressing the evidence because it constituted testimonial hearsay. The district court found that the labelled swabs collected during the SANE exam constituted SANE Vandiver's testimonial statements that the evidence was what it claimed to be—DNA evidence collected from Victim. The court found that those testimonial statements were subject to a Confrontation Clause analysis under *Carmona*, which the State could not satisfy as SANE Vandiver was not available for cross-examination at trial nor at a previous opportunity. The court declined the State's suggestion that this case fell into an ongoing emergency exception to the Confrontation Clause.

**DISCUSSION**

{6}     The State appeals from the district court's order suppressing the statements of SANE Vandiver contained within the SANE test kit. We first address the State's argument that *Carmona* does not apply in circumstances of an unknown perpetrator, then turn to the argument that the evidence was collected for the primary purpose of solving an ongoing emergency. We review a district court's determination that evidence is inadmissible under the Confrontation Clause de novo. *State v. Zamarripa*, 2009-NMSC-001, ¶ 22, 145 N.M. 402, 199 P.3d 846.

{7}     The Confrontation Clause of the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her]." U.S. Const. amend. VI. Accordingly, courts

cannot admit into evidence any "out-of-court statement that is both testimonial and offered to prove the truth of the matter asserted . . . unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *Navarette*, 2013-NMSC-003, ¶ 7 (citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). Defining a statement as testimonial requires analyzing it under the "primary purpose" test: "a statement can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution." *Id.* ¶ 8. "[T]he Confrontation Clause is violated only if the testimonial statement is offered to prove the truth of the matters asserted." *Id.* ¶ 12.

{8} Especially relevant for cases such as this and *Carmona*, "an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted." *Navarette*, 2013-NMSC-003, ¶ 13. To reiterate then, the declarant of some determinative fact on which an expert opinion turns "must testify at trial and be subject to cross-examination, or alternatively must be unavailable, and the defendant must have had a prior opportunity to cross-examine the declarant." *Id.*

{9} In *Carmona*, we contemplated a set of facts very similar to those presented here. The state sought admission of DNA evidence collected from a minor victim in a SANE exam—again performed by SANE Lydia Vandiver—following Vandiver's

5

passing, depriving the defendant of an opportunity to cross-examine her at his ensuing trial. *See Carmona*, 2016-NMCA-050, ¶¶ 1-4. In the suppression hearing, the former director of the Albuquerque SANE Collaborative testified to the process Vandiver would have used to collect the evidence. *Id.* ¶¶ 5-9. The state offered testimony of chain of custody witnesses regarding the subsequent DNA testing. *Id.* ¶ 10. This Court upheld the district court order suppressing the DNA expert's opinion because the basis for that opinion included testimonial statements from SANE Vandiver that upon admission at the defendant's trial would violate the Confrontation Clause. *Id.* ¶ 42. We concluded that the plainly stated principles in *Navarette* indicate that "the Confrontation Clause prohibits the admission of DNA evidence collected by an unavailable SANE and any expert testimony based thereon when the primary purpose animating the SANE's collection of such evidence is to assist in the prosecution of an individual identified at the time of the collection." *Carmona*, 2016-NMCA-050, ¶ 13. The only factual distinction of consequence is that in *Carmona*, the perpetrator was known at the time of the SANE exam. *Id.* ¶ 2.

**Unidentified Perpetrator**

{10}    The State argues that *Carmona* does not apply to this case because the perpetrator in the instant case was unknown at the time of DNA collection, unlike in *Carmona*—a status directly observed to be of import in *Carmona*'s holding. The State points out that in both *Navarette* and *Carmona*, the perpetrator was known at

6

the time of the autopsy and SANE exams. *See Navarette*, 2013-NMSC-003, ¶¶ 2-4; *Carmona*, 2016-NMCA-050, ¶ 2. In the State's view, *Carmona* only directly applies to cases where the perpetrator is "identified at the time of the collection." 2016-NMCA-050, ¶ 13. The State also looks to *Navarette* for support, relying on our Supreme Court's clarifications of the United States Supreme Court's fractured opinion in *Williams v. Illinois*. 567 U.S. 50 (2012). "[E]ven if a statement . . . does not target a specific individual, the statement *may* still be testimonial." *Navarette*, 2013-NMSC-003, ¶ 10 (emphasis added). The State posits that the word "may" is permissive, so statements targeting nonidentified individuals are not necessarily testimonial.

{11}     The State is correct in that neither *Navarette* nor *Carmona* produce a bright-line rule for whether statements made by a SANE examiner against unidentified individuals are testimonial for Confrontation Clause purposes. But that alone does not mean that the constitutional principles at play within those cases are not equally applicable here. As was the case in *Carmona*, *Navarette* again guides our analysis on what constitutes testimonial evidence: "Statements are testimonial when the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Navarette*, 2013-NMSC-003, ¶ 8 (alteration, omission, internal quotation marks, and citation omitted). In *Carmona*, we held that there was "no doubt that the [SANE nurse's] statements were made with the primary

7

purpose of establishing a fact—that [the d]efendant's DNA was found on [the victim]—for use in a future criminal proceeding against [the d]efendant." 2016-NMCA-050, ¶ 38. In the recent case of *State v. Tsosie*, our Supreme Court agreed with our assessment that "statements relating to the requested swabs [in a SANE exam] were clearly for forensic purposes," even when the primary holding of that case permitted many victim statements to a SANE to be admitted for nontestimonial purposes. 2022-NMSC-017, ¶¶ 112, 114, 516 P.3d 1116. *Tsosie* too, however, related to a known defendant at the time the SANE exam was conducted. *Id.* ¶ 18.

{12}     Here, testimony from the former SANE executive director indicated that SANE Vandiver placed an evidence tag on this rape kit, placed it in an evidence locker, and that a chain of custody identified who had possession of the kit. The former executive director referred to SANE exam kits as "evidence." Regardless of whether the perpetrator's identity was known or not, the clinic used the same basic terms to refer to the rape kit as if they were preparing for a future criminal proceeding. SANE Vandiver's DNA collection process described by the director was meant to collect evidence and relay it to law enforcement officials. Indeed, nothing about the process, SANE Vandiver's statements, or anything related to the test kit was meaningfully different from the acquisition of the same evidence in *Carmona*. More notably, nothing was done differently based upon the absence of a known individual or suspected perpetrator. Thus, in all applicable respects, we find

8

this factual scenario to be analogous to *Carmona*. Regardless of whether the perpetrator was known, a SANE examination was conducted primarily to produce admissible evidence so that the perpetrator would eventually be prosecuted for the alleged crime.

{13}     This outcome comports with our Supreme Court's guidance in *Navarette* under the seventh principle gleaned from *Williams*: "[A]n out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted." *Navarette*, 2013-NMSC-003, ¶ 13. The Court distilled this principle from the four dissenting justices in *Williams*, combined with Justice Thomas's concurrence with the judgment: "'[t]here is no meaningful distinction between disclosing an out-of-court statement so that the fact[-]finder may evaluate the expert's opinion and disclosing that statement for its truth.'" *Navarette,* 2013-NMSC-003, ¶ 14 (quoting *Williams*, 567 U.S. at 106 (Thomas, J., concurring in the judgment)). Offering the rape kit swabs in this case as the basis of an expert witness's testimony for a DNA comparison—like in *Carmona*—effectually would offer the swabs for the truth of the matter asserted, that they contained DNA from Victim's SANE examination. Otherwise, the expert's testimony would be irrelevant to the case at hand. *See Carmona*, 2016-NMCA-050, ¶ 37. Unlike a circumstance where the item tested for DNA evidence had characteristics independently identifiable by a victim, such as a piece of the victim's clothing, the swabs in this case are

9

nondescript medical objects that are irrelevant without the testimony of SANE Vandiver.

{14} The State's interpretation of *Carmona* emphasizes that we relied on the fact that the individual was identified to support the holding that the statements were testimonial in nature, but we do not view our holding so narrowly. *See id.* ¶ 38. Rather, in analyzing the context of the statements for their primary purpose, we also considered that the DNA expert testified that the SANE exam's primary purpose was for use in future criminal prosecution and that the victim did not require additional medical attention. *Id.* The evaluation in *Carmona* was not an elemental analysis, but rather a set of collective circumstances this Court identified. The suspect's identity, the expert testimony, and the lack of medical necessity were among countless considerations that could be analyzed in a highly fact-dependent determination such as the primary purpose test. Regardless of whether the perpetrator's identity was known, the SANE examination was conducted with the primary purpose that the person whose DNA contributed to that present on the swab could be prosecuted for the alleged crime. It is apparent to us that SANE Vandiver made the statements associated with her use of the swab during Victim's exam "primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution." *See Navarette*, 2013-NMSC-003, ¶ 8. That Defendant's

identity was unknown at the time of the SANE examination does not change enough to justify a departure from the outcome in *Carmona*.

{15} Insofar as the State argues that the district court misinterpreted *Navarette*, *Carmona*, or *Williams*, we are unconvinced. Foremost, applying the principles of New Mexico Confrontation Clause jurisprudence as already described, SANE Vandiver's statements comfortably fall within the boundaries of Confrontation Clause material. The State's attempts to distinguish *Navarette* by claiming it is unsupported by a sufficient number of justices in *Williams* appears to ask us to overrule our Supreme Court's decision, which we cannot do. "Appeals in this Court are governed by the decisions of the New Mexico Supreme Court—including decisions involving federal law, and even when a United States Supreme Court decision seems contra." *Dalton v. Santander Consumer USA, Inc.*, 2015-NMCA-030, ¶ 30, 345 P.3d 1086 (internal quotation marks and citation omitted), *rev'd on other grounds*, 2016-NMSC-035, 385 P.3d 619. To find that the State's articulation of the holding in *Williams* controls in this case would contradict the seventh principle espoused in *Navarette*, which we cannot and will not consider. *See State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 21, 135 N.M. 375, 89 P.3d 47 (stating that the Court of Appeals is bound by Supreme Court precedent). It is apparent to us that the established Confrontation Clause jurisprudence of New Mexico indicates that these statements are testimonial hearsay that cannot be subject

11

to cross-examination to satisfy the Confrontation Clause. If change is to come to this analytic framework established in New Mexico jurisprudence, it begins with *Navarette* and therefore must come from our Supreme Court. Until then, we must conclude the district court did not err in suppressing SANE Vandiver's statements as to the evidence swabs.

**Ongoing Emergency Exception**

{16}     We next turn to the State's argument that the district court erred in suppressing SANE Vandiver's statements because they fall into the ongoing emergency exception to the Confrontation Clause analysis. The State argues that Vandiver's statements were made to assist law enforcement in protecting both Victim and the public from a serial stranger-rapist. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than proving past events potentially relevant to later criminal prosecution." *Michigan v. Bryant*, 562 U.S. 344, 361 (2011) (alteration, internal quotation marks, and citation omitted). "Rather, [the emergency] focuses [participants] on ending a threatening situation." *Id.* (internal quotation marks and citation omitted). "In the end, the

question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (alteration, internal quotation marks, and citation omitted).

{17} In *Bryant*, the United States Supreme Court determined there to be an ongoing emergency when "an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the victim] within a few blocks and a few minutes of the location where police found [the victim]." 562 U.S. at 374. As our Supreme Court described *Bryant*, "the Court first looked to the circumstances surrounding the interrogation to determine if there was an ongoing emergency, then viewed the conduct of the interrogators and the declarant in light of that determination." *State v. Largo*, 2012-NMSC-015, ¶ 12, 278 P.3d 532. "In *Bryant*, the Court looked to the type and scope of the danger posed to the victim, to the public, and the police to determine the existence of an ongoing emergency." *Largo*, 2012-NMSC-015, ¶ 13. The Court also looked to the existence of the suspect's known motives, use of a weapon, physical separation from attacker, and the formality of the interrogation. *Id.* ¶¶ 13-14. Accordingly, the Court found that a mortally wounded victim's statements to a 911 operator about the identity of an armed shooter a few minutes after the attack were "nearly identical" to the relevant circumstances in *Bryant*. *Largo*, 2012-NMSC-015, ¶ 21.

{18} We acknowledge the complexity of applying the ongoing emergency exception to statements by a SANE examiner when the doctrine primarily has been applied to conversations between victims and first responders. It is true that the United States Supreme Court has noted that statements made to individuals who are not law enforcement officers "are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246. For example, in evaluating whether a child's comments to a teacher were testimonial, the Court looked to the ongoing nature of the potential abuse, the imminent release of the child to a potential abuser, the child's security, and the risk to other children. *See id.* at 247. Still, the Court's inquiry focused on whether the statements were taken for the primary purpose of gathering evidence. *See id.* Our Supreme Court recently clarified the dual nature of a SANE exam—both for medical care and forensic investigation—in *Tsosie. See* 2022-NMSC-017. In *Tsosie*, the Court explained that many statements a victim makes to a SANE nurse do circumvent the Confrontation Clause analysis because they are made for medical diagnosis and thus not testimonial hearsay. *Id.* ¶ 114. But the Court was clear that the admission of evidence considered in *Tsosie* was not a "statement[] relat[ed] to the requested swabs," which were instead "clearly for forensic purposes." *Id.* ¶ 112.

{19} The State asserts SANE Vandiver's statements associated with the swabs were collected to protect both Victim and the public from a likely serial stranger-

rapist. Starting with the formality of the declarant's conduct, we note that evidence proffered in this case was from a formal process of evidence collection, more akin to questioning in a police station than the other statements made by Victim in the SANE exam for medical diagnosis. *See id.* ¶¶ 37, 78. The emergency associated with the crime in this case—despite its violence—had very likely ended if SANE Vandiver was attesting to statements that warranted inclusion on evidence tags. Such statements suggest that the emergency had ended, and the statements were "to establish or prove past events potentially relevant to later criminal prosecution." *See Davis*, 547 U.S. at 822. By the time of the SANE exam, Victim had already physically removed herself from the location of the assault and gone to the police. Moreover, the physical and temporal separation informs our perspective that the emergency to some extent had ended, even if there was a potential for the rapist to confront Victim or another member of the public at some unknown point in the future. Although a stranger-rapist on the loose decidedly presents a threat to the community, the risk does not present the same threatening situation as *Bryant* or *Largo*. *See Bryant*, 562 U.S. at 358; *Largo*, 2012-NMSC-015, ¶ 14.

{20}     Although SANE nurses do function in a dual role, this case presents only statements made in SANE Vandiver's forensic role of "collecting and preserving evidence of value to the legal system." *See Tsosie*, 2022-NMSC-017, ¶ 44 (internal quotation marks and citation omitted). The specific statements that the State is trying

to submit to the district court include evidence tags. SANE Vandiver's statements contained information to establish a chain of custody over a perpetrator's DNA primarily for authenticating evidence in a criminal prosecution. Especially in light of how the SANE clinic describes the exam kits, we hold that SANE Vandiver's statements were made to collect evidence for the future prosecution of the unknown and yet unapprehended rapist and not as a communication made during an ongoing emergency. While the unknown identity of the perpetrator in this case likely did motivate an urgency to find the perpetrator and prevent future harm to Victim or other potential victims, it cannot be said that these statements were made with any primary purpose other than future prosecution.

{21}    The State should use every tool in its arsenal to identify and apprehend unknown assailants, but that does not mean that the constitutional standards for introducing testimony at trial are waived merely because of the degree of difficulty facing investigators at the onset of investigation. We are unpersuaded that the unknown identity of the perpetrator at the time of Victim's examination changes the purpose for why SANE Vandiver collected the DNA evidence in this case. It is only logical to infer that when SANE Vandiver placed the swabs from Victim's exam into the collection bags, she did so with the apparent purpose to prepare the evidence for later use in a subsequent criminal prosecution. Now, the State wishes to offer these out-of-court statements for the truth of the matter asserted. Without Defendant

16

having an opportunity to cross-examine SANE Vandiver, applicable precedent compels upholding the suppression of SANE Vandiver's statements associated with the collected swabs of DNA evidence.

**CONCLUSION**

{22}    For the above reasons, we affirm.

{23}    **IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JACQUELINE R. MEDINA, Judge**

**MEGAN P. DUFFY Judge, specially concurring**

17

**DUFFY, Judge (specially concurring).**

{24} I concur with today's opinion, but write separately because New Mexico's body of confrontation jurisprudence since *Carmona* was decided leaves me with reservations about its continued application.

{25} *Carmona* held that a SANE nurse's act of placing swabs in pre-marked envelopes indicating the location of the body from which they were taken constitutes testimonial hearsay. 2016-NMCA-050, ¶¶ 7, 40. The import of this holding is that the SANE nurse who collected the swabs must appear and testify, otherwise the DNA analysis developed from the swabs is inadmissible. Because the SANE nurse who had conducted the examination in *Carmona* had passed away before the case went to trial, the State was effectively prohibited from introducing DNA evidence linking the defendant to his alleged victim.

{26} *Carmona*'s rationale was grounded in general principles distilled from then-recent United States Supreme Court Confrontation Clause cases, and from our Supreme Court's opinion in *Navarette*, which similarly went to great lengths to make sense of the fractured federal cases. It was no easy task to unearth general principles that received the support of at least five justices. That notwithstanding, there is one common thread among all of the federal cases: they involved testimony from an analyst who developed a report based on samples gathered from another source, and not, as here, the person who collected the original sample. *See Melendez-Diaz v.*

18

*Massachusetts*, 557 U.S. 305 (2009) (addressing laboratory technician's report certifying chemical analysis of cocaine found on the defendant); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (addressing certificate of analysis containing statements from lab technician who certified the blood alcohol content in the defendant's blood sample); *Williams*, 567 U.S. at 56 (addressing a laboratory report containing a DNA profile developed from samples collected from swabs taken from the victim).

{27}     Since *Carmona*, New Mexico courts have decided that a phlebotomist who collects a blood sample need not testify at a DWI trial in order to admit the laboratory's blood-alcohol report. *See State v. Franklin*, 2020-NMCA-016, ¶ 27, 460 P.3d 69; *State v. Costello*, A-1-CA-35091, mem. op. ¶ 12 (N.M. Ct. App. Feb. 19, 2018) (nonprecedential) ("[T]he blood-draw procedures and qualifications of the phlebotomist are non-testimonial facts that do not implicate the Confrontation Clause."). We recognized that the phlebotomist would offer nothing more than "preliminary factual evidence to establish a foundation for the admission of evidence to be used at trial," *Costello*, A-1-CA-35091, mem. op. ¶ 15, and "once the state ha[s] satisfied the foundation requirements, 'the need to cross-examine the blood drawer is reduced to questions of the chain of custody,' which 'does not provide grounds for a confrontation objection to the admissibility of a blood-alcohol report.'" *Franklin*, 2020-NMCA-016, ¶ 27 (quoting *State v. Nez*, 2010-NMCA-092, ¶¶ 13-

19

14, 16, 148 N.M. 914, 242 P.3d 481). Rather than requiring the phlebotomist's testimony, we have said that a police officer who witnessed the administration of the blood draw can establish the necessary foundation. *Franklin*, 2020-NMCA-016, ¶ 25.

{28} It is not apparent what distinction we could draw that would compel a different result for swabs collected by a SANE nurse. Both a blood sample and swabs collected during a SANE exam contain "statements" identifying the source of the evidence. *See Carmona*, 2016-NMCA-050, ¶ 37. Given this, it is unclear why information identifying the source of the sample would amount to testimonial hearsay in the case of a SANE exam, but not for a blood draw in a DWI case. Rather, the identifying information on the envelopes containing the swabs implicates the authenticity of the sample—a foundational matter. And if the SANE nurse is unavailable to testify, the victim could establish the foundation necessary for admission based on personal observation, much like a police officer in the blood-draw scenario. This approach is in keeping with the plurality's observation in *Melendez-Diaz*, that not everyone "whose testimony may be relevant to establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." 557 U.S. at 311 n.1.

{29} Since *Carmona*, this same issue involving the same SANE nurse has come up again and again. *Cf. Carmona*, 2016-NMCA-050, ¶ 8 (noting that this particular

20

SANE nurse performed a third of the total examinations in any given month). Early on, the State asked this Court to revisit and overturn *Carmona*, but this Court continues to adhere to its precedent, and the State now seems to have abandoned that effort. *See, e.g.*, *State v. Martinez*, A-1-CA-35640, mem. op. ¶¶ 11-16 (N.M. Ct. App. May 15, 2019) (nonprecedential). However, in light of our more recent Confrontation Clause case law, it is perhaps time that *Carmona* received another look.

_____
**MEGAN P. DUFFY, Judge**

21