This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Decision Number:_____**

**Filing Date: June 26, 2014**

**NO. 33,756**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.

**JOSE A. GARCIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**William C. Birdsall, District Judge**

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Yvonne Marie Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**BOSSON, Justice.**

{1}    A jury found Defendant Jose Garcia guilty of intentional child abuse resulting in the death of seventeen-month old Taegan McKinney, and the district court sentenced him to life imprisonment. On appeal, Defendant argues that (1) the district court violated his confrontation right by allowing testimony by an expert forensic pathologist who did not perform the autopsy, (2) the district court improperly instructed the jury, (3) Defendant's trial counsel was ineffective, (4) the district court erred in admitting Defendant's shoes and statements into evidence, (5) the conviction was not supported by substantial evidence, and (6) the district court erred in not holding a preliminary hearing on the charge of intentional child abuse. For the reasons discussed below, we affirm the district court and the conviction.

**I.    BACKGROUND**

{2}    On the evening of April 14, 2007, Defendant was with Akasha (Casey) Morriston; they were babysitting Taegan, age seventeen months, and her brother Connor McKinney, age four. The children's mother dropped them off at Casey's house on her way to work at around 5:00 p.m.

{3}    Denessa Starkey testified that around 6:00 p.m., she drove over to Casey's

house to cut Casey's hair. Ms. Starkey further testified that Taegan did not appear ill or injured while she was there; she left a little after 9:00 p.m.

{4}    On April 15, 2007, at about 3:00 a.m., emergency medical technicians (EMTs) were dispatched to a call for a child not breathing. When EMTs arrived at the address provided to dispatch, they observed two men performing CPR on a child on the living room floor; she was pale and not breathing. The child was Taegan McKinney. EMTs attempted to insert a tube through the child's mouth to establish a clear airway, but were unable to open her mouth because her muscles had stiffened, a sign of rigor mortis. EMTs also noticed a shoe impression on the child's abdomen. They called their medical control and told them the child had been unconscious for an unknown amount of time, rigor mortis had set in, she did not have a pulse and was not breathing, and "that [there were] indications of trauma that was present on the child's belly from a shoe print." At that point, EMTs were advised by medical control to cease their efforts to revive the child. After the police arrived, EMTs informed police of the shoe imprint on the child's abdomen.

{5}    At the scene, police questioned Defendant. In the course of the initial interview, Defendant told investigators that earlier that evening he stepped on Taegan—he believed on her foot—while trying to jump over a pile of clothes. This occurred

2

shortly after 9:00 p.m. Defendant made these revelations in the bedroom where this incident occurred, while the officer and Defendant sat beside each other on the bed, talking.

{6} Defendant told the officer that he picked Taegan up and comforted her after he realized that had he stepped on her, and placed her on the bed, but then fifteen minutes later she fell over and vomited. He said he cleaned Taegan up, held her, and then laid down with her for a little bit, but she was fussy so he got up to watch a movie while Casey fed her with a bottle in the bedroom. Defendant told the officer that Casey returned from the bedroom to finish the movie with Defendant and Connor, "cause [Taegan] finally fell asleep, cause we were trying to get her to go to sleep the whole night, and she'd go to sleep for about five minutes and then just wake up, start screaming and crying." After the movie, Casey went to get Taegan. Defendant said that Casey came out of the room "screaming and crying and she brought the baby back and she said she was dead."

{7} People began arriving at Casey's house while Defendant and the officer were still talking in the bedroom. The atmosphere outside the house became more charged, and the officer asked Defendant to accompany him to the sheriff's office so they could talk in a calmer atmosphere. Defendant agreed, and they drove together to the sheriff's

office to continue the interview. Ultimately, Defendant was arrested. Additional facts will be discussed as required below.

**II.    DISCUSSION**

**A.    Expert Testimony Regarding the Cause and Manner Of Death Did Not Violate the Confrontation Clause**

{8}    Dr. Kurt Nolte of the Office of the Medical Investigator (OMI), an expert witness for the State, reviewed the autopsy records and testified regarding the cause and manner of Taegan's death. He did not perform, nor was he present at, the autopsy. Two other doctors at OMI, Dr. Harada and Dr. Nine, performed the autopsy but did not testify at trial.

{9}    Defendant argued pre-trial, at trial, and before this Court that under *Bullcoming v. New Mexico*, 131 S.Ct. 2705, __ U.S. __ (2011), the Sixth Amendment's Confrontation Clause does not permit *any* forensic pathologist to testify *unless* the State establishes that the pathologist who performed the autopsy is *unavailable*. *Bullcoming* does not apply as broadly as Defendant suggests. *See id*. at S.Ct. 2713-2718 (holding that if a forensic laboratory report that contains a testimonial certification is admitted into evidence, a defendant has the right to confront the analyst that certified the report).

{10}    Subsequent to *Bullcoming*, this Court has reviewed the testimony of forensic

4

pathologists who did not perform the autopsy, but who were allowed to testify regarding the cause and manner of death. *See, e.g.*, *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435. Defendant also argues that *Navarette* should bar Dr. Nolte's testimony.

{11}    Under *Navarette*, a forensic pathologist who does not perform the autopsy may nonetheless offer an expert opinion as long as the forensic pathologist does not merely repeat the subjective observations made by the non-testifying pathologist who performed the autopsy. *Id.* ¶ 22. As an example, in *Navarette* the presence or absence of soot or stippling (evidence of gun powder residue) on the decedent's body helped to establish which of two individuals fired the fatal shots, because it established the distance of the shooter from the victim. *Id.* ¶ 6. Because of the nature of soot or stippling evidence, it was not preserved in any of the raw data contained in the autopsy report, only in the recorded observations of the autopsy pathologist. *Id.* ¶ 21. Accordingly, a subsequent pathologist could not arrive at his own, independent opinion about the presence of soot or stippling because there was no raw data to review. Since the testifying pathologist in *Navarette* merely parroted the subjective opinion of the absent autopsy pathologist regarding soot or stippling, and thereby, established the identity of the shooter, we held that "Navarette's confrontation rights

were violated." *Id.* ¶ 23. We reversed the conviction and remanded for a new trial.

{12}     In *State v. Sisneros*, 2013-NMSC-049, 314 P.3d 665, we also reviewed expert testimony by a non-autopsy-performing pathologist regarding the cause and manner of death. We held that the expert's testimony violated the Confrontation Clause in so far as it merely repeated the opinion of the autopsy pathologist. *Id.* ¶ 31. However, the cause and manner of death were not in dispute in that prosecution. In *Sisneros*, therefore, any Confrontation Clause violation was harmless error. *Id* ¶ 33. We further observed and reaffirmed that an expert may review an autopsy report and come to an independent opinion, based on raw data and objective markers. *Id.* ¶ 28.

{13}     Dr. Nolte testified that in preparation for his own expert testimony, he reviewed Taegan's entire autopsy file, including autopsy photographs admitted into evidence. We have "*not* . . . sa[id] that all material contained within an autopsy file is testimonial and therefore inadmissible." *Navarette*, 2013-NMSC-003, ¶ 22 (emphasis added). In *Navarette*, we observed that the expert did not offend the Confrontation Clause when, "after being shown the autopsy photographs, [he] expressed his own opinion about the entry and exit wounds, explaining the basis for his opinion." *Id.* In this case, the State moved the photographs of Taegan taken at the autopsy—and reviewed by Dr. Nolte—into evidence. Defendant did not object. Defendant does not argue to this

6

Court that it was error to admit the photographs, and he candidly acknowledges that photographs may be used to form an independent opinion about the nature and cause of an injury without violating the Confrontation Clause. At trial, the State methodically presented those photographs to Dr. Nolte and asked for his opinion regarding the injuries shown.

{14} In discussing the autopsy photographs, Dr. Nolte occasionally referred in passing to the comments made by the autopsy pathologists. Once, when asked to describe the injury shown in a photograph of the back of Taegan's head, Dr. Nolte testified "that is a bruise, right here, which the pathologist who handled this case described as a reverse J [bruise], and I think that's the J that they were seeing which was on the back portion of the head, on the scalp." Dr. Nolte offered his own independent opinion, based on those photographs, that this was a "blunt force injury" and that it was likely "one impact" that created the bruise.

{15} Dr. Nolte further testified that "these injuries don't show any evidence of healing," after which he described the healing process of bruises and how changes in coloration may establish where the bruise is in the healing process. Next, Dr. Nolte was shown a photograph of bruises behind Taegan's left ear, and he stated that it depicted "three bruises described by the [autopsy] pathologist." He opined that blood

7

in the ear *visible in the photograph* was, to a reasonable degree of medical certainty, "blood that has run down the face and pooled in the ear" from a tear of the tissue connecting the upper lip to the gum.

{16} We are satisfied that, taken as a whole, Dr. Nolte's testimony was based on his own observations and conclusions from what he saw and read, opinions that were independently conceived. Occasional and incidental references to what was said in the autopsy report were more for purposes of identification and were not prejudicial to Defendant.

{17} Dr. Nolte also discussed a number of additional photographs of bruises and injuries to Taegan's head, providing his opinion regarding the injuries depicted therein. The State then asked him, "so far in all of the pictures we have looked at, have you seen any injuries that look to be old or healing," Dr. Nolte responded, "I have not." However, he followed his opinion by adding, "I must say that Dr. Harada did describe some degree of green color on two areas of contusion. I did not see that color change in my review of the photographs." As he had previously discussed, reviewing the healing process of bruises, green coloration would indicate a bruise that was not fresh but had already begun to heal. Dr. Nolte noted there were two areas where Dr. Harada indicated evidence of healing, the left side of the head and the forehead;

8

however, in Dr. Nolte's opinion there was no evidence that healing had begun. When Dr. Nolte referred to Dr. Harada's opinion regarding evidence of healing, he noted that it directly contradicted his own opinion—that there was *no* evidence of healing.

{18}     Defendant's primary concern with Dr. Nolte's testimony is that his opinion contradicts what Defendant wanted to establish at trial—that some of the injuries could have occurred earlier, which would undermine the State's argument that Defendant was responsible for the fatal injuries. Dr. Nolte expressed his own independent opinion, and now Defendant attacks that opinion by attacking Dr. Nolte's observation that Dr. Harada disagreed with him. Importantly, what Dr. Nolte said about Dr. Harada's observation regarding coloration of the bruises *assisted* Defendant, it corroborated Defendant's theory of the case that the bruises were caused by someone else. Dr. Nolte's testimony regarding certain *favorable* references to Dr. Harada's observations causes no prejudice to Defendant. It also creates no confrontation issue for us to decide.

{19}     If Defendant wanted testimony from Dr. Nine or Dr. Harada to corroborate his theory of when the fatal injuries occurred, he was free to attempt to call them as witnesses for the defense. *See Williams v. Illinois*, 132 S.Ct. 2221, 2228 (2012) (observing that a defendant "who . . . wishes to probe the reliability of the DNA

testing done in a particular case" may subpoena the analyst who participated in the testing and question the analyst at trial). The State was not obliged to call those witnesses to help Defendant's case.

{20}     Ultimately, Dr. Nolte testified regarding his opinion as to the cause and manner of death:

>   Prosecutor: Did you form your own opinion as to the cause and manner
>   of death of Taegan McKinney?
>   Dr. Nolte: Yes ma'am
>   Prosecutor: What's, what is that?
>   Dr. Nolte: Ah, I would classify it *the same way as Doctors Nine and*
>   *Harada classified it*, which was multiple blunt force injuries.
>   Prosecutor: Are you able to determine the mechanism of the injuries?
>   Dr. Nolte: The mechanism of the injuries?
>   Prosecutor: Yes.
>   Dr. Nolte: I think the mechanism of the injuries are that she was beaten,
>   and I think that the imprint on the abdomen likely reflects that she was
>   stomped.

(Emphasis added.)

{21}     As observed above, Defendant's argument is premised on his belief that the Confrontation Clause does not permit *any* forensic pathologist to testify *unless* the State establishes that the pathologist who performed the autopsy is *unavailable*. This belief is not supported by the case law. *See, e.g.*, *Navarette*, 2013-NMSC-003, ¶ 22 ("[A]n expert witness may express an independent opinion regarding his or her own interpretation of raw data without offending the Confrontation Clause."); *see also*

*Sisneros*, 2013-NMSC-049, ¶ 30 ("[A]n expert witness may offer an expert opinion based on raw data, such as autopsy photographs . . . taken by others.").

{22} Further, the State called a second forensic pathologist from OMI, Dr. Clarissa Krinsky, who was listed as a witness for the defense. Dr. Krinsky also was not present at the autopsy, but reviewed the complete autopsy file, the same as Dr. Nolte, and gave her opinion as to the cause and manner of death being "multiple blunt force injury" and "homicide." Dr. Krinsky further testified that "all the injuries that [she] discussed . . . [occurred] before or around the time of [Taegan's] death."

{23} Defendant makes no argument to this Court that Dr. Krinsky's testimony violated his right to confrontation. In an abundance of caution, we have reviewed her testimony, and we have found no confrontation issue. Dr. Krinsky's testimony and Dr. Nolte's testimony were similar. Both opined, based on their observations and review of the autopsy file, regarding the cause and manner of death. Both opined that all the injuries occurred at or near the time of death. The only difference appears to be that Dr. Nolte mentioned contradictory opinions put forth by Dr. Harada and Dr. Nine in the autopsy report that Defendant wished to elicit as direct evidence. Defendant has suffered no deprivation of constitutional rights to confrontation by virtue of Dr. Nolte's and Dr. Krinsky's testimony.

11

## B.     The Jury Instructions Did Not Result In Fundamental Error

{24}     Defendant asserts that the district court erred because it "instructed the jury in this case that [the jury] had to find that Jose acted intentionally in order to convict him of negligent child abuse." He argues that this instruction created a fundamental error in the trial because it left the jury with *only one* option, to convict him of intentional child abuse, since it effectively equated intentional and negligent child abuse. Defendant was charged with intentional child abuse, and in the alternative with negligent child abuse. He was convicted of intentional child abuse.

{25}     Since Defendant did not object to the jury instructions, we review his claim for fundamental error. *State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016. When this Court reviews jury instructions for fundamental error, we will only reverse the jury verdict if doing so is "necessary to prevent a miscarriage of justice." *Id.* ¶ 13 (internal quotation and citation omitted). "[C]ases in which a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused" may result in a miscarriage of justice. *State v. Barber*, 2004-NMSC-019, ¶ 17, 135 N.M. 621, 92 P.3d 633. First, "[w]e must determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* ¶ 19. If so, we then review the jury instruction in context and only reverse if "the

12

"[d]efendant's conviction was the result of a plain miscarriage of justice." *Id.* (internal quotation and citation omitted).

{26}     Regarding one count, the abuse of a child, *see* NMSA 1978 § 30-6-1(D) (2009) (defining the crime of child abuse), the district court instructed the jury on intentional abuse of a child resulting in death, along with the definition of intentional. *See* UJI 14-602 NMRA (providing the jury instruction for the crime of child abuse); *see also* UJI 14-610 NMRA (providing the jury instruction defining intentional). The district court then instructed the jury on negligent child abuse resulting in the death of a child. In so doing, the district court stated, "[t]he defendant has also been charged *in the alternative* with negligent child abuse . . . ." (Emphasis added.) In concluding the instructions as to Count 1, the district court instructed:

> In this case . . . there are three possible verdicts as to the defendant (1) guilty of intentional child abuse resulting in death; (2) guilty of negligent child abuse resulting in death; (3) not guilty; [o]nly one of the possible verdicts may be signed by you as to the defendant. You must consider each of these crimes. You should be sure that you fully understand the elements of each crime before you deliberate further. You will then consider whether the defendant is guilty of the crime of intentional child abuse resulting in death. *If you find him guilty of that crime, then that is the only form of verdict which is to be signed. If you have a reasonable doubt as to his guilt of that crime, you will go on to a consideration of the crime of negligent child abuse resulting in death.* If you find him guilty of that crime, then that is the only form of verdict which should be signed. But if you have a reasonable doubt as to his guilt of the crime of negligent child abuse resulting in death, then you should find him not

guilty and sign only the not guilty form. You may not find the defendant guilty of more than one of the foregoing crimes. . . .

(Emphasis added.) Defendant does not argue that the district court erred in this jury instruction.

{27}     What Defendant actually argues is that the district court erred when it instructed the jury regarding general criminal intent. After instructing the jury on other crimes, tampering with evidence and battery of a household member, the district court instructed the jury regarding general criminal intent. *See* UJI 14-141 NMRA, Note 1 ("This instruction must be used with every crime except for the relatively few crimes not requiring criminal intent or those crimes in which the intent is specified in the statute or instruction."). When the district court listed the crimes in the general intent instruction, it included intentional child abuse and negligent child abuse, in addition to tampering with evidence and battery of a household member.

{28}     Defendant is correct that UJI 14-610 (providing the instruction for the crime of child abuse) states that "UJI 14-141 NMRA, general criminal intent, shall not be given in child abuse cases and child abandonment cases." UJI, 14-610, Note 1. When the district court included the charges of intentional and negligent child abuse in the list of crimes in the general intent instruction, the district court committed error.

{29}     The question, however, is whether this resulted in prejudice and fundamental

14

error to Defendant. Defendant argues that because the jury was instructed that it was required to find that he acted purposefully to convict him of negligent child abuse, it was impossible for him to be convicted of negligent child abuse. Thus, Defendant argues, the jury instruction resulted in prejudice to him, forcing the jury to either convict him of intentional child abuse or not at all.

{30}    We do not agree.  If anything, the error benefitted Defendant.  Any confusion on the part of the jury would have increased the burden on the State to prove that Defendant purposefully committed the act of which he was convicted. Also, even though the instruction as given meant the State bore a higher burden regarding the charge of negligent child abuse, the jury could have still convicted Defendant of negligent child abuse. It did not. The jury convicted Defendant of intentional child abuse.  As instructed, that was the only form of verdict which was signed by the jury. At that point, there is no evidence that the jury considered negligent child abuse—it was instructed not to do so. Thus, the district court's error in this instance was harmless. More importantly, we see no likelihood that the jury was confused or misled by the district court's mistake.

**C.    Defendant's Allegation Of Ineffective Assistance Of Counsel**

{31}    Defendant asserts ineffective assistance of counsel because his trial counsel did

15

not object to the jury instructions as discussed above and "failed to convey the causation problem with the timing of the head injuries."

{32}    Defendant's assertion regarding the lack of objection to the jury instructions, that "there is no argument that this was a tactical decision" is without merit. As discussed above, the instructions given ostensibly increased the State's burden required to gain a conviction. It is possible that counsel made a tactical decision at trial to let the jury deliberate as instructed, instead of objecting to the error, thereby increasing the likelihood that the State would not carry its burden of proof.

{33}    Defendant also asserts that his counsel was ineffective because he failed to call "an expert or otherwise bring forth the causation problem with the head injuries." He cites *State v. Aragon*, 2009-NMCA-102, ¶ 15, 147 N.M. 26, 216 P.3d 276 (holding that defense counsel acted unreasonably based on "her failure to engage an expert for consultation, combined with her failure to conduct adequate pre-trial interviews of the State's experts") to support his argument. *Aragon* is not applicable. Here, defense counsel conducted pre-trial interviews of the experts who testified. Defense counsel identified Dr. Krinsky as an expert witness, although it was the State who called Dr. Krinsky to testify at trial. Additionally, defense counsel did elicit evidence at trial that Defendant asserts he did not elicit—the opinion that some experts opined that a

16

number of the bruises showed signs of healing. This came in through the testimony of Dr. Nolte, although his own opinion contradicted it. Also, in his closing argument defense counsel pointed out Defendant's theory about signs of healing being evidence that someone other than Defendant caused the injuries. Defendant's arguments that he received ineffective assistance of counsel are without merit, but Defendant is not constrained from pursuing ineffective assistance of counsel claims on habeas.

**D.      The District Court Did Not Err In Admitting Defendant's Statements and Shoes Into Evidence**

{34}      Defendant argues that the district court erred when it denied his motion to suppress evidence of (1) his statements to police, and (2) his shoes.

{35}      Defendant asserts that the police did not properly advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding that statements made during a custodial interrogation may not be admitted unless a defendant was advised of his legal rights that "secure the privilege against self-incrimination"). But, "[a] suspect's *Miranda* rights attach only when he is the subject of a custodial interrogation." *State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442) (internal quotation marks and citation omitted). If Defendant was not subject to a custodial interrogation at the time the statements were made, then the officers were not required to advise him of his rights under *Miranda*. *See id.* ¶ 20.

17

**{36}** The district court determined that Defendant was not subject to a custodial interrogation, and therefore no *Miranda* advisement was required. Giving deference to factual findings, we review the legal conclusion of a custodial interrogation de novo. *Id.* ¶ 19. Our test is objective, considering whether under the circumstances "a reasonable person would believe that he or she were not free to leave" or where the interrogation was inherently coercive. *State v. Munoz*, 1998-NMSC-048, ¶ 40-41, 126 N.M. 535, 972 P.2d 847.

**{37}** Defendant first argues that a custodial interrogation took place at the house, when a detective interviewed him in the bedroom. He premises his argument on the facts that (1) two police officers were *at the house*, and (2) he was questioned alone, away from other people.

**{38}** At the scene, officers asked Defendant if he was willing to speak to them about what happened; Defendant replied, "that's fine." One detective followed Defendant into the bedroom to see where Taegan had been earlier in the evening. Defendant was not handcuffed, he was free to move around, and he gave the detective his story freely without being asked many questions. When Defendant was telling his story, he and the detective were sitting beside each other on the bed. The interview in the bedroom lasted ten to fifteen minutes. While they were in the bedroom, nothing blocked

Defendant's access to the door, and there were no other officers in the room. Because tensions were escalating in the house as other people began to arrive, the detective asked Defendant if he would accompany the detective to the sheriff's office to talk some more away from the scene. Defendant waited for the detective to get his truck and then rode to the office with the detective in the front seat of the detective's truck. Objectively, these circumstances do not amount to a custodial interrogation; therefore, officers were not required to advise Defendant of his *Miranda* rights at the time.

{39}     Defendant also argues that he was subject to a custodial interrogation at the sheriff's office. He relies on the fact that he was questioned in a small interrogation room. While at the sheriff's office, Defendant stated that he was ready to go home. Ultimately, Defendant was arrested at the sheriff's office. At the sheriff's office, the detective informed Defendant (1) that he was not under arrest; (2) that he was free to leave at any point, but they would drive him home after the interview if he wanted; (3) that there were going to be some questions that "[he] might not want to answer"; and (4) of his rights under *Miranda*, except that the detective did not mention that counsel would be appointed if Defendant could not afford it. Defendant's access to the door was not blocked, the door was unlocked, and Defendant was not restrained. In fact, Defendant acknowledges that he left the room unaccompanied on at least one

occasion. Reviewing the record, we affirm the district court's determination that the circumstances did not amount to a custodial interrogation.

{40} Defendant further argues that the district court erred by denying his motion to suppress the evidence of his shoes. He maintains that the alleged significance of his shoes resulted from the allegedly coercive police interviews discussed above. During the interviews, Defendant admitted that the shoes he was wearing were the same shoes he was wearing the previous night when he stepped on Taegan. Defendant's shoes were collected as evidence and analyzed by an expert who compared the outsole pattern of the shoes to photographs of injuries on Taegan's abdomen. The expert testified that the impression on Taegan's abdomen was made by a shoe that was the same size and had the same outsole pattern as Defendant's right shoe.

{41} As our Court of Appeals has observed, "the failure to give *Miranda* warnings did not require suppression of evidence that [is] the fruit of a [defendant's] unwarned but *voluntary* statements." *State v. Olivas*, 2011-NMCA-030, ¶ 18, 149 N.M. 498, 252 P.3d 722 (quoting *United States v. Patane*, 542 U.S. 630 (2004)). We affirm the district court's determination that Defendant was not subject to a custodial interrogation when the statements were given—Defendant's statements were voluntary. Accordingly, we affirm the district court's denial of the motion to suppress

20

the evidence of Defendant's shoes based on the statements given during his interviews.

**E.      Defendant's Conviction Is Supported By Substantial Evidence**

{42}      In reviewing the record for sufficiency, "[e]vidence is viewed in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). We will not second guess the jury concerning witness credibility, the weight of the evidence, or judgment. *Id.*

{43}      In his brief, Defendant argues that "[t]he State simply proved that [Taegan] died from blunt force trauma to her head and/or abdomen, but failed to prove that [Defendant] caused the head injuries or . . . the abdominal injuries intentionally." We disagree. Based on the trial testimony, Taegan was in the custody of both Defendant and Casey at the time the fatal injuries occurred. Both Defendant and Casey testified at trial that the other person—alone—had control of Taegan for a period of time, and before that time Taegan had no visible injuries. Both testified that they had no idea how the injuries to Taegan's head, arms, and legs occurred. Essentially, Defendant and Casey each implied that the other person injured Taegan. They pointed fingers at

21

each other.

{44}     Testimony and evidence established that Defendant and Casey were fighting that night. Both Defendant and Casey showed physical signs of violence—photographs of Casey showed bruises from that evening and Defendant had a broken hand. Dr. Nolte's testimony and Dr. Krinsky's testimony established that Taegan's fatal injuries occurred during the period of time that Taegan was in the custody of Defendant and Casey. In addition, Defendant admitted to stepping on Taegan, and expert testimony linked the imprint on Taegan's abdomen to the shoes Defendant was wearing.

{45}     We will never know with certainty what happened that evening, but in a case like this, one that is reduced to witness credibility, the fact finder is the ultimate arbiter. In this case, the jury concluded that Defendant's story was less credible than Casey's. Viewed in the light most favorable to sustain the conviction, the evidence was sufficient to support the jury's determination that Defendant committed the crime of intentional child abuse resulting in death.

**III.     CONCLUSION**

{46}     The remainder of Defendant's arguments are without merit. For the reasons discussed above, we affirm the verdict of the jury and the judgment of the district

22

court.

{47}     **IT IS SO ORDERED.**

_____

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**BARBARA J. VIGIL, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

23