Certiorari Denied, May 11, 2016, No. S-1-SC-35851

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-050**

**Filing Date:  March 17, 2016**

**Docket No. 33,378**

**STATE OF NEW MEXICO,**

     **Plaintiff-Appellant,**

**v.**

**MARIO CARMONA,**

     **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Jacqueline D. Flores, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellant

Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## OPINION

**HANISEE, Judge.**

**{1}**     The State appeals the district court's order suppressing its expert's opinion that Defendant's DNA was contained in samples taken from an alleged victim by a now-deceased Sexual Assault Nurse Examiner (SANE). We affirm.

**BACKGROUND**

**{2}** In 2003, nine-year-old P.W. told her mother that Defendant (whom P.W.'s mother had invited to stay overnight at her house as a guest) entered P.W.'s bedroom at night and licked her vagina and anus. P.W.'s mother called the police, who took P.W. and her mother to St. Joseph's Hospital (now known as the Women's hospital) to be examined. P.W. was examined by Lydia Vandiver (SANE Vandiver), who swabbed P.W. for DNA evidence and collected her clothing, bedding, and other personal effects.

**{3}** Defendant was charged by grand jury indictment with three counts of criminal sexual contact of a minor (CSCM) in the third degree, in violation of NMSA 1978, § 30-9-13(A) (2003). After his arrest, Defendant was sent to Colorado to serve the remainder of a sentence for an unrelated criminal conviction. In 2011, Defendant was released and his prosecution in New Mexico resumed. On the State's motion, the district court ordered that Defendant submit to a buccal swab to facilitate comparison of his DNA to that present in the samples collected from P.W. eight years earlier by SANE Vandiver.

**{4}** In 2013, and with the case still pending, SANE Vandiver died. Defendant moved to suppress the DNA evidence and a report prepared by the State's expert witness, Alanna Williams, comparing the evidence collected by SANE Vandiver with that from Defendant's buccal swab. Defendant argued that without SANE Vandiver's in-court testimony, (1) the State could not establish a chain of custody for the swabs or the relevance of Ms. Williams' opinion; and (2) admitting the DNA evidence gathered from P.W.'s body by SANE Vandiver would violate his right to confront the witnesses against him as guaranteed by the Sixth Amendment to the United States Constitution.

**{5}** At a hearing on Defendant's motion to suppress, P.W. testified about her physical examination, during which SANE Vandiver "removed [her] clothing, [then] shook them out onto a plastic tarp or paper in order to collect any hairs or DNA samples that might be in there." When asked about SANE Vandiver's collection of the DNA evidence, P.W. stated that she first observed SANE Vandiver remove swabs from labeled glass vials. P.W. described the swabs as "like Q-tips, but long[.]" SANE Vandiver "swabbed me in various areas, such as my anus, my vagina, into the crack of my butt and places like that where the DNA might have been." When finished, SANE Vandiver "put [the swabs] back in the vial and screwed them up and [then] put them . . . in a bag, in a manil[]a envelope." P.W. did not recall SANE Vandiver swabbing any other areas of her body.

**{6}** Constance Monahan, a statewide SANE coordinator and director of the Albuquerque SANE Collaborative at the time of the alleged assault, also testified. Ms. Monahan knew SANE Vandiver at the time P.W. was examined in 2003. Ms. Monahan testified that SANE Vandiver was the clinical coordinator for the Albuquerque SANE program, and a "key nurse instructor[]" for New Mexico's statewide SANE training program. Ms. Monahan was also aware that SANE Vandiver received specialized training for pediatric examinations at Para Los Niños under the tutelage of Dr. Renee Ornelas, and that SANE Vandiver worked as a

contract clinician and attended various seminars on forensic nursing. As well, SANE Vandiver provided formal SANE training to nurses statewide and personally performed sexual assault examinations at various hospitals in Albuquerque.

{7}   Regarding the manner by which evidence was collected during a typical sexual assault examination, Ms. Monahan stated that

> [the SANE] would . . . meet the patient at the clinic, and then there would be a general process from—or guidelines, in terms of the questions asked . . . [the SANE] then move[s the patient] into an exam room [to] do the evidence collection and the medical documentation of injury, and then the discharge.

As to evidence collection kits, and in particular the so-called "fast track kits" used at the time and employed by SANE Vandiver to examine P.W., Ms. Monahan testified as follows:

> The New Mexico sexual assault evidence kit is a standardized packaging and process for evidence collection from sexual assault victims, whatever their age. Inside the kit is a series of envelopes and brown bags and directions and forms . . . [that are] standardized in New Mexico.
>
> . . . .
>
> The envelopes [in the fast track kit] were preprinted to indicate the orifice or the location of the body. . . . The swabs were inside already in the envelopes. So when the nurse opened up the kit, she would reach for the smaller envelope and inside, the swabs would be there.
>
> . . . .
>
> The primary purpose would be for consistency, to treat all victims, patients the same way, and it would be to standardize[] the process, so that we were all doing it the same way in New Mexico.

{8}   According to Ms. Monahan, SANE Vandiver performed a third of the total examinations in any given month at the hospital where the SANE program was based. Ms. Monahan testified that SANE Vandiver averaged around "[ten] to [twenty] shifts a month" and within her shifts typically handled anywhere from "ten to fifteen [cases] a month over the course of two and [one-]half years."

{9}   Ms. Monahan's own job duties included acting as the custodian of evidence collected by SANEs, including SANE Vandiver. It was expected that once a SANE had removed and utilized swabs, returned them into and sealed the kit, that SANE would next place the kit inside an empty locker or a locked refrigerator through a slot. That evidence was then accessible only by Ms. Monahan, who possessed the lone access key. Once a week, Ms.

Monahan would collect logs and samples from the locker and refrigerator, place them into a large duffel bag, and deliver the bag to the Albuquerque Police Department crime laboratory. Ms. Monahan testified that this process was followed for P.W.'s swabs, and that she recognized SANE Vandiver's signature on evidence logs she retrieved. Ms. Monahan personally delivered the evidence SANE Vandiver collected from P.W. to police investigators on April 29, 2003.

{10}    Additionally, the State proffered testimony of various chain-of-custody witnesses and of its DNA analyst, Ms. Williams, who would testify that the chain of custody regarding the swabs she examined indicated that they were those used to collect evidence from P.W. by SANE Vandiver. Based on a comparison of a profile developed from DNA found on the swabs and a profile developed from DNA on Defendant's buccal swab, Ms. Williams would conclude that Defendant's DNA was present on the swabs taken from P.W. by SANE Vandiver. The State further explained that Ms. Williams' testimony would be based on the labels affixed to the envelopes containing swabs that SANE Vandiver had used on P.W.

{11}    Defendant's attorney argued that introduction of Ms. Williams' testimony would violate the Confrontation Clause because

> the SANE examiner has a tremendous amount of discretion in terms of how to conduct the test . . . SANE kits are not medical procedures; it's evidence collection. It's equivalent to a technician taking picture[s] at a scene or collecting bullet casings. . . . And it's testimonial, because it's offered for prosecution. It's collected for prosecution, and therefore the credibility and motives of the people involved are at issue[.]

{12}    On multiple rationales, the district court granted Defendant's motion to suppress. First, applying Rule 11-401 NMRA, the district court determined that the DNA evidence was not relevant. Second, it ruled that the State "failed to establish a reliable chain of custody." Third, it concluded that admitting the DNA evidence would violate Defendant's right to "confront and cross-examine witnesses[.]" The State appeals.

**DISCUSSION**

**The Confrontation Clause Prohibits the Introduction of a Hearsay Statement When Its Declarant Is Unavailable to Testify in Person and Its Primary Purpose Is to Establish or Prove Past Events Potentially Relevant to Later Criminal Prosecution**

{13}    We review the district court's determination that evidence is inadmissible under the Confrontation Clause de novo. *State v. Zamarripa*, 2009-NMSC-001, ¶ 22, 145 N.M. 402, 199 P.3d 846. To assess whether admission of the DNA evidence collected by SANE Vandiver or Ms. Williams' expert testimony would violate the Confrontation Clause, we first summarize the holding in *Crawford v. Washington*, 541 U.S. 36 (2004), the seminal United States Supreme Court case in this area. Second, we explain the "primary purpose" test for

4

determining the scope and application of the Confrontation Clause first set out in *Davis v. Washington*, 547 U.S. 813 (2006). Third, we discuss the United States Supreme Court's application of the "primary purpose" test in the context of scientific evidence and expert testimony. Finally, we apply our own Supreme Court's more recent decision in *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435. Our analysis of modern Confrontation Clause jurisprudence points squarely to the following conclusion: the Confrontation Clause prohibits the admission of DNA evidence collected by an unavailable SANE and any expert testimony based thereon when the primary purpose animating the SANE's collection of such evidence is to assist in the prosecution of an individual identified at the time of the collection.

1.      ***Crawford* Eliminated a Reliability-Focused Confrontation Clause Analysis and Established a Context-Based Evaluation to Ascertain Whether a Statement Amounts to Testimonial Hearsay**

**{14}**    The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In *Ohio v. Roberts*, the Supreme Court interpreted the Confrontation Clause to permit the admission of an unavailable witness's hearsay statements (assuming other grounds for admissibility are met) if the statement bears "adequate indicia of reliability." 448 U.S. 56, 66 (1980) (internal quotation marks omitted), *overruled by Crawford*, 541 U.S. at 42, 68-69. This interpretation of the Confrontation Clause prevailed until the Court decided *Crawford* and adopted a stricter interpretation of the right at stake. 541 U.S. at 68-69.

**{15}**    *Crawford* observed that the text of the Confrontation Clause illustrates its purpose: combating the use of *ex parte* statements against the accused. *Id*. at 51. That text indicates the Clause's limits, as well: it only "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " *Id*. (citation omitted). *Crawford* inferred that the term "witness" as used in the Clause applied only to a particular category of witness testimony, and not to any and every out-of-court statement—in other words, not all hearsay, only "testimonial hearsay." *Id.* at 51, 53. *Crawford* concluded that the Confrontation Clause prohibits the introduction of testimonial hearsay unless the accused has had the opportunity to cross-examine the declarant. *Id.* at 54.

**{16}**    *Crawford* also identified "[v]arious formulations of this core class of 'testimonial' statements[:]"

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, [and] statements that were made under circumstances which would lead an objective witness reasonably to believe

5

that the statement would be available for use at a later trial[.]

*Id.* at 51-52 (alteration, internal quotation marks, and citations omitted). Although the Court noted that "testimony at a preliminary hearing, before a grand jury, . . . a former trial; [or statements during] police interrogations" were all sufficient to trigger the Confrontation Clause, *id.* at 68, the Court declined to predefine any necessary criteria for determining whether a given piece of evidence is "testimonial." *See Ohio v. Clark*, ___ U.S. ___, ___, 135 S. Ct. 2173, 2179 (2015) ("[O]ur decision in *Crawford* did not offer an exhaustive definition of 'testimonial' statements.").

2.      **In *Davis*, the Supreme Court Held That the "Primary Purpose" for Which a Statement Is Made Determines Whether It Is Testimonial**

**{17}**    In *Davis*, the Supreme Court returned its attention to the Confrontation Clause, and articulated a more generalized rule for determining whether a statement constitutes testimonial hearsay when it does not fall within the "core class" of testimonial statements set out in *Crawford*:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

**{18}**    *Davis* applied the "primary purpose" test to separate appeals, one raising a Confrontation Clause challenge to the transcript of a 911 call made by a domestic violence victim, the other challenging a "battery affidavit" executed by another victim. *Id.* at 817-20. The Court held that a domestic violence victim's statements to the 911 operator were non-testimonial because they concerned ongoing events involving a "bona fide physical threat[,]" not a description of events that had already passed. *Id.* at 827. "[V]iewed objectively," the Court reasoned, the questions asked of the victim by the 911 operator were designed to solicit answers "necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Id.* (emphasis omitted). By contrast, the Court found that a "battery affidavit" executed by the victim of domestic violence was testimonial because it provided a "narrative of past events [that] was delivered at some remove in time from the danger [the victim] described. And after [the victim] answered the officer's questions, he had her execute an affidavit, in order, he testified, 'to establish events that have occurred previously.' " *Id.* at 831-32 (alteration and citation omitted).

6

**{19}** *Davis* delineates an important distinction between initial information gathered by law enforcement that is not necessarily motivated by a desire for later use in a criminal prosecution, and information gathered once any emergency has been resolved and the police have turned their attention to collecting evidence for use in a criminal prosecution against a known criminal perpetrator. When this latter purpose primarily motivates the activities of law enforcement or other state actors, the future-accused's right under the Confrontation Clause to test a hearsay declarant's testimony during trial is triggered.

### 3. The Supreme Court's Fractured Application of the "Primary Purpose" Test When Applied to Scientific Evidence and Expert Testimony Leaves Lower Courts With Little Guidance

**{20}** Even more recently, the Supreme Court applied *Davis*'s "primary purpose" test to chemical analysis reports in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), and to DNA analysis in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012). Although the Supreme Court was more or less unified in its resolution of *Crawford* and *Davis* (no justice dissented from either judgment), the Court was barely able to assemble a majority of justices in *Melendez-Diaz* and *Bullcoming*. And in *Williams*, the case most directly on point, the Supreme Court was unable to obtain majority support for any one rationale analyzing the Confrontation Clause implications of an expert's reliance on hearsay statements made by an unavailable declarant in reaching her opinion.

### a. *Melendez-Diaz* Holds That a Laboratory Certification That Identifies a Substance to Be Cocaine Is Testimonial Hearsay

**{21}** *Melendez-Diaz* concerned "certificates of analysis" containing sworn statements by laboratory analysts that substances found in bags seized from the defendant contained cocaine. 557 U.S. at 308. The Court held that the certificates fell within the core exemplars of testimonial hearsay identified in *Crawford*: although "denominated by Massachusetts law [to be] 'certificates,' [they] are quite plainly affidavits: declarations of facts written down and sworn to by the declarant before an officer authorized to administer oaths. They are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310 (alteration and citation omitted) (quoting *Crawford*, 541 U.S. at 51). The Court also found that the statements failed *Davis*'s "primary purpose" test: under the Massachusetts statute providing for the admission of the test results into evidence, the "*sole purpose*" of the certificates "was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance[.]" *Id.* at 311 (internal quotation marks and citation omitted).

**{22}** Joined by three colleagues, Justice Kennedy dissented. He maintained that the majority had "swe[pt] away an accepted rule governing the admission of scientific evidence . . . based on" *Crawford* and *Davis*, "two recent opinions that say nothing about forensic analysts[.]" *Id.* at 330 (Kennedy, J., dissenting). Justice Kennedy reasoned that the rule

7

allowing for the admission of scientific analysis without requiring the in-person testimony of the analyst had historical pedigree, and that by rejecting it the Court had created more problems than it solved: because so many individuals "play a role in a routine test for the presence of illegal drugs[,]" he worried that classifying all such evidence as testimonial under the Confrontation Clause would have the practical effect of preventing the prosecution from presenting any scientific evidence whatsoever. *Id.* at 332-33 (Kennedy, J., dissenting). Justice Kennedy concluded that the Confrontation Clause's reference to "witnesses against [the defendant]" limits its application to only lay witnesses "who perceived an event that gave rise to a personal belief in some aspect of the defendant's guilt[,]" *id.* at 344 (Kennedy, J., dissenting), and that the Confrontation Clause was not intended to include "analysts who conduct scientific tests far removed from the crime and the defendant." *Id.* at 347 (Kennedy, J., dissenting).

b.     ***Bullcoming* Holds That a Report Analyzing Blood and Certifying Its Alcohol Content Is Testimonial Hearsay**

**{23}**     In *Bullcoming*, the state sought to admit a State Laboratory Division (SLD) Report of Blood Alcohol Analysis. 564 U.S. at ___, 131 S. Ct. at 2710. The report contained a "certificate of analyst," which contained various statements by a lab technician who was unavailable to testify at the defendant's trial. *Id.* at ___, 131 S. Ct. at 2710-12. The certificate of analyst stated that the blood-alcohol concentration (BAC) in the defendant's blood sample was 0.21 grams per hundred milliliters. *Id.* at ___, 131 S. Ct. at 2710. The certificate also affirmed that the integrity of the sample had not been compromised and that the required procedures for handling and testing the sample had been followed. *Id.* at ___, 131 S. Ct. at 2710-11.

**{24}**     *Bullcoming* ruled the certificate implicated the Confrontation Clause because "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Id*. at ___, 131 S. Ct. at 2717 (citing *Melendez-Diaz*, 557 U.S. at 311). Even though the certificate of analyst was unsworn, the laboratory analyst was required by statute to prepare the report when provided with a sample by law enforcement, certify the results of the test on a document, and further formalize the document by signing it on a form that makes reference to magistrate and municipal court rules for admitting the report into evidence. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2717. The Supreme Court further noted that operation of the gas chromatograph testing machine "requires specialized knowledge and training. Several steps are involved in the gas chromatograph process, and human error can occur at each step." *Id.* at ___, 131 S. Ct. at 2711. These formalities and the amount of human discretion involved in the creation of the certificate, the Supreme Court concluded, were "more than adequate to qualify [the analyst's] assertions [in the certificate] as testimonial." *Id.* at 2717; *see also State v. Huettl*, 2013-NMCA-038, ¶ 37, 305 P.3d 956 ("What has emerged as clearly impermissible is an expert's testimony which is based solely upon a non-testifying analyst's analysis and conclusions." (citing *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2717-18)).

**{25}** Again writing on behalf of the dissenting justices as in *Melendez-Diaz*, Justice Kennedy denounced as a "hollow formality" the requirement that the technician who prepared the BAC report testify regarding "routine authentication elements for a report that would be assessed and explained by in-court testimony subject to full cross-examination" of the witness who had knowledge of the processes for authenticating the samples. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2723-24 (Kennedy, J., dissenting).

**c.    *Williams* Upholds the Admission of an Expert's Opinion That the Defendant's DNA Was Found on Swabs Taken From the Victim, But Does Not Offer a Controlling Rationale in Support of Its Holding**

**{26}** In *Williams*, 567 U.S. ___, 132 S. Ct. 2221, the Supreme Court applied the Confrontation Clause to the admission of expert scientific testimony based on hearsay. The victim in *Williams* had been kidnapped and raped by an unknown assailant and was taken to a hospital. *Id*. at ___, 132 S. Ct. at 2229. There, doctors treated the victim's wounds and took a blood sample and vaginal swabs, sealed the swabs, and submitted them to a crime lab for testing. *Id.* At the crime lab, a technician performed a chemical test on the swabs, confirmed the presence of semen, resealed the kit, and placed it in a secure freezer. *Id.* Police then sent the swabs from the victim to Cellmark Diagnostics Laboratory (Cellmark), which contracted with the state to perform DNA testing. *Id.* Cellmark tested the swabs and returned a report to the police containing a male DNA profile derived from semen found on the swabs. *Id.* The police matched the profile produced by Cellmark with an earlier profile derived from a sample taken as a result of the defendant's arrest years before. *Id.* The victim identified the defendant as her assailant during a lineup, and the state charged the defendant with rape, kidnapping, and aggravated robbery. *Id.*

**{27}** The state did not call as witnesses the technicians at Cellmark who had actually developed a DNA profile from the samples collected from the victim's swabs. *Id.* Instead, the state called the forensic scientist who had used a chemical test to confirm the presence of semen on the vaginal swabs taken from the victim, a forensic analyst who had developed a DNA profile from the blood sample taken from the defendant when he was arrested in 2000, and a third expert who had compared this DNA profile with the profile created by Cellmark. *Id.* The third expert testified that the Cellmark profile matched the profile generated from the sample taken in 2000, stating both that it was common within the scientific community for experts to rely on records generated by other DNA experts, and that she and other experts in her field regularly relied on shipping manifests and other labels in assuming that the DNA evidence they analyzed was authentic. *Id.* at ___, 132 S. Ct. at 2230.

**{28}** The defendant challenged the admission of the expert's comparison of the two samples, arguing that the expert's reliance on testing performed by Cellmark's employees (who did not testify) violated the Confrontation Clause. *Id.* The state responded that the defendant's right was not violated because Defendant had an opportunity to cross-examine the analyst who had developed a profile from the 2000 sample and the analyst who had compared the results of the 2000 sample with the Cellmark profile. *Id.* at ___, 132 S. Ct. at

9

2231. The state also argued that under Rule 703 of the Federal Rules of Evidence, "an expert is allowed to disclose the facts on which the expert's opinion is based even if the expert is not competent to testify to those underlying facts." *Id.* at \_\_\_, 132 S. Ct. at 2231. The prosecutor concluded that "any deficiency in the foundation for the expert's opinion doesn't go to the admissibility of that testimony, but instead goes to the weight of the testimony. " *Id.* (alterations, internal quotation marks, and citation omitted). The trial court agreed and overruled the defendant's objection to the expert's comparison of the two DNA profiles. *Id.*

**{29}** *Williams* rejected the defendant's arguments in a split opinion with no controlling rationale. A plurality of four justices—the same four who dissented in *Melendez-Diaz* and *Bullcoming*—would have held that the expert's testimony was not hearsay (and therefore not subject to scrutiny under the Confrontation Clause) because it was not offered for the truth of the matter asserted. *Id.* at \_\_\_, 132 S. Ct. at 2236-41 (plurality opinion). This plurality reasoned as follows:

> [The] expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood. Thus . . . the report was not to be considered for its truth but only for the distinctive and limited purpose of seeing whether it matched something else. The relevance of the match was then established by independent circumstantial evidence showing that the . . . report was based on a forensic sample taken from the scene of the crime.

*Id.* at \_\_\_, 132 S. Ct. at 2240-41 (internal quotation marks and citation omitted).

**{30}** In the alternative, the plurality concluded that the defendant's Confrontation Clause right was not violated even if the Cellmark DNA analysis had been admitted into evidence to prove that the Defendant's DNA had been found in vaginal swabs from the victim because the analysis "plainly was not prepared for the primary purpose of accusing a targeted individual." *Id.* at \_\_\_, 132 S. Ct. at 2243 (plurality opinion). The plurality identified two non-testimonial purposes behind the DNA evidence: (1) "catch[ing] a dangerous rapist who was still at large"; and (2) because the DNA analysis is divided among numerous technicians, "it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures[,]" not accusing the defendant of wrongdoing. *Id.* at \_\_\_, 132 S. Ct. at 2243-44. The plurality also identified three factors that minimized any likelihood that the evidence had been fabricated: First, the plurality noted that "no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate [the defendant]—or for that matter, anyone else whose DNA profile was in a law enforcement database." *Id.* Second, it is possible to detect whether the DNA sample used by Cellmark had been degraded based on the profile itself; it was not necessary to conduct an independent examination of the DNA swabs themselves. *Id.* at \_\_\_, 132 S. Ct. at 2244. Third,

[a]t the time of the testing, [the defendant] had *not yet been identified* as *a suspect*, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of [the defendant], who just so happened to be picked out of a lineup by the victim. The prospect is beyond fanciful.

*Id.* at ___, 132 S. Ct. at 2244 (emphasis added).

**{31}** Unlike in *Melendez-Diaz* and *Bullcoming*, Justice Thomas concurred with the previously dissenting justices and thereby provided the controlling fifth vote to affirm the Illinois Supreme Court's judgment upholding Defendant's conviction. He disagreed with the plurality's first conclusion that the Cellmark report was not hearsay. *Id.* at ___, 132 S. Ct. at 2256 (Thomas, J., concurring in judgment). Justice Thomas wrote that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose." *Id.* at ___, 132 S. Ct. at 2257 (Thomas, J., concurring in judgment). He reasoned that

[t]o use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true. If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert's conclusions.

*Id.* (internal quotation marks and citations omitted).

**{32}** Justice Thomas concluded that the Cellmark report implicated the Confrontation Clause—i.e., it was hearsay—because the state's expert's opinion was entirely reliant on assertions in the Cellmark report that "the profile [Cellmark] reported was in fact derived from [the victim's] swabs, rather than from some other source." *Id.* at ___, 132 S. Ct. at 2258 (Thomas, J., concurring in judgment). Justice Thomas nonetheless concurred in the result, because in his view "[t]he Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained." *Id.* at ___, 132 S. Ct. at 2260 (Thomas, J., concurring in judgment).

**{33}** The four-justice dissent—comprised of the *Melendez-Diaz* and *Bullcoming* majority but without Justice Thomas—would have held the Cellmark report to be testimonial because it was "identical to the [blood sample report] in *Bullcoming* (and [the drug content test in] *Melendez-Diaz*) in all material respects." *Id.* at ___, 132 S. Ct. at 2266 (Kagan, J., dissenting) (internal quotation marks and citation omitted). The dissent argued that the Cellmark report was "made to establish some fact in a criminal proceeding—here, the

11

identity of [the victim's] attacker." *Id.* (internal quotation marks and citation omitted). The dissent similarly reasoned that, like the gas chromatographical test for blood alcohol content in *Bullcoming*, "the Cellmark analysis has a comparable title; similarly describes the relevant samples, test methodology, and results; and likewise includes the signatures of laboratory officials." *Id.* at ___, 132 S. Ct. at 2266-67 (Kagan, J., dissenting).

**{34}** Amplifying the ideological split in Confrontation Clause analyses generated post-*Crawford* regarding scientific evidence, the plurality charged that the dissent would have no qualms with the prosecutor asking its expert whether "there [was] a computer match generated of the male DNA profile produced by Cellmark to a male DNA profile that had been identified as having originated from [the defendant.]" *Id.* at ___, 132 S. Ct. at 2236 (plurality opinion) (emphasis omitted); *see also id.* at ___, 132 S. Ct. at 2267 (Kagan, J., dissenting). But because the prosecutor had instead asked the expert whether "there [was] a computer match generated of the male DNA profile found in semen from the vaginal swabs of [the victim] to a male DNA profile that had been identified as having originated from [the defendant]," the dissent concluded that admitting the state's expert witness's testimony violated the defendant's Confrontation Clause right. *Id.* at ___, 132 S. Ct. at 2236 (plurality opinion) (emphasis omitted); *id.* at ___, 132 S. Ct. at 2267 (Kagan, J., dissenting).

**4.** **Under *Bullcoming* and Our Supreme Court's Controlling Interpretation of *Williams*, SANE Vandiver's Absence Requires the Exclusion of Ms. Williams' Expert Opinion That Defendant's DNA Was Found on Swabs Taken From P.W.**

**{35}** In *Navarette*, our Supreme Court read *Williams* to stand for (among others) the following propositions: (1) "that a statement can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution[,]" *id.* ¶ 8; (2) "even if a statement . . . does not target a specific individual, the statement may still be testimonial[,]" 2013-NMSC-003, ¶ 10; and (3) "an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted[,]" *id.* ¶ 13, and is therefore subject to exclusion if its primary purpose is testimonial.

**{36}** *Navarette* answered whether the Confrontation Clause "preclude[s] a forensic pathologist from relating subjective observations recorded in an autopsy report as a basis for the pathologist's trial opinions, when the pathologist neither participated in nor observed the autopsy performed on the decedent." *Id.* ¶ 1. Our Supreme Court held that the statements were subject to exclusion because the autopsy was performed as part of a homicide investigation and the pathologist who had performed the autopsy had a statutory duty to report possible deaths by homicide to law enforcement. *Id.* ¶¶ 15-17. The Court reasoned that "the medical examiner's findings as to the cause of death and as to soot, stippling, and gunpowder all went to the issues of whether [the victim's] death was a homicide and, if so, who shot him. These issues reflected directly on [the defendant's] guilt or innocence." *Id.* ¶ 17.

**{37}** Here, the basis for Ms. Williams' opinion that Defendant's DNA was found on P.W.'s body is SANE Vandiver's hearsay statements that the swabs came from P.W. As our Supreme Court noted, such "basis" evidence amounts to the admission of out-of-court statements to prove the truth of the matter they assert (i.e., to prove that the DNA was found on P.W.'s body) and therefore must be subjected to Confrontation Clause scrutiny. *See id.* ¶ 13. We are not persuaded by the State's argument that Ms. Williams relied on the swabs themselves, not SANE Vandiver's statements on the envelopes containing the swabs. Had Ms. Williams testified that she had found Defendant's DNA on swabs (and did not disclose that the swabs were taken from P.W.), her testimony would be irrelevant because it would not make it any more or less probable that Defendant had in fact touched P.W. *See* Rule 11-401(A) ("Evidence is relevant if it . . . has any tendency to make a fact more or less probable than it would be without the evidence[.]"). It is Ms. Williams' reliance on the statements identifying P.W. as the source of the swabs that supplies relevance to Ms. Williams' expert testimony. Without SANE Vandiver's statements linking the swabs Ms. Williams tested to the examination of P.W. (and the portions of P.W.'s body on which a swab was used), Ms. Williams' testimony would be that Defendant's DNA was found on various swabs of unknown origin.

**{38}** The context of SANE Vandiver's examination of P.W. leaves no doubt that the statements were made with the primary purpose of establishing a fact—that Defendant's DNA was found on P.W.—for use in a future criminal proceeding against Defendant. *See Navarette*, 2013-NMSC-003, ¶ 8 ("[A] statement can only be testimonial if the declarant made the statement primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution.") First, P.W. had already identified Defendant as the one who touched her inappropriately before she was examined by SANE Vandiver, so it cannot be argued that the swabs were used in order to identify and apprehend P.W.'s unknown, dangerous assailant. Second, because P.W. was not in need of emergency medical treatment, there is no basis to conclude that the swabs were taken in "surrounding circumstances" that suggest a nontestimonial primary purpose. *See State v. Mendez*, 2010-NMSC-044, ¶¶ 37-39, 148 N.M. 761, 242 P.3d 328 (holding that a hearsay statement made to a SANE by a victim who testifies at trial is admissible under Rule 11-803(4) NMRA based upon the statement's medical purpose despite the otherwise primarily testimonial purpose of a SANE examination). Third, as Ms. Monahan testified, the "primary purpose" of the SANE kits was to create reliable, consistent DNA evidence for testing and use in future criminal prosecutions. As was the case with the medical examiner in *Navarette*, SANE Vandiver would have reasonably expected that her collection of swabs from P.W. and her placement of those swabs in envelopes labeled "vagina," and "anus," all go to the issue of whether Defendant improperly touched P.W., and therefore "reflect[] directly on [Defendant's] guilt or innocence." 2013-NMSC-003, ¶ 17.

**{39}** In recently addressing nearly identical circumstances in *Commonwealth v. Jones*, 37 N.E.3d 589 (Mass. 2015), the Supreme Judicial Court of Massachusetts was asked whether the Confrontation Clause permitted "the [c]ommonwealth to introduce, through the testimony of an expert witness who was not present when the victim's 'rape kit' examination

13

was performed, evidence concerning how the various swabs that the expert tested were collected." *Id.* at 592. *Jones*, like this case, involved allegations that the defendant had touched the alleged victim's genitals. *Id.* at 594. And as is the case here, the commonwealth in *Jones* sought to prove the defendant's guilt by offering expert opinion testimony that the defendant's DNA was found in the area surrounding the alleged victim's genitals. *Id.* Finally, like the State here, the commonwealth in *Jones* did not offer at trial the testimony of the nurse who personally examined the alleged victim. *Id.* at 595. Rather, the trial court "permitted the [c]ommonwealth's first expert witness, who was not present during the examination . . . to testify to her 'understanding' of how the three swabs had been collected." *Id.* Like Ms. Williams here, the commonwealth's expert's "understanding" of how the three swabs were collected was "based . . . on information the expert learned from the 'evidence collection inventory list' purportedly completed by the nurse who conducted the 'rape kit' examination." *Id.*

**{40}** Citing the same Supreme Court authority our Supreme Court in *Navarette* applied and we apply today, *compare Navarette*, 2013-NMSC-003, ¶¶ 7-21, *with Jones*, 37 N.E.3d at 596, 600, the *Jones* court found that the defendant's Confrontation Clause rights were violated because the statements identifying various swabs and the inventory list affixed to the "rape kit" were in essence "a series of factual statements concerning how the various swabs were collected." *Jones*, 37 N.E.3d at 596. The court reasoned that these statements were "plainly testimonial" because " 'a reasonable person in the speaker's position would anticipate his findings and conclusions being used against the accused in investigating and prosecuting a crime[.]' " *Id.* at 597 (alterations omitted) (quoting *Clark*, ___U.S. at ___, 135 S. Ct. at 2181). Applying both the United States and our Supreme Court's controlling interpretations of the Confrontation Clause, the same logic applies in this case with equal force. SANE Vandiver's statements on the labels affixed to the kit are testimonial hearsay because SANE Vandiver would have reasonably understood those statements' sole purpose to be for use in investigating and prosecuting criminal charges against Defendant. Allowing Ms. Williams to testify that Defendant's DNA had been found on P.W. based on inferences from labels on the examination kit prepared by SANE Vandiver "would be akin to allowing a chemist to testify to the chemist's 'understanding,' based on information relayed to the chemist in a report drafted by nontestifying police officers, that a substance later determined to be cocaine had been found in the defendant's trouser pocket." *Jones*, 37 N.E.3d at 598.

**{41}** In support of its argument that introduction of Ms. Williams' expert testimony would not violate the Confrontation Clause, the State cites *Fencher v. State*, 931 So. 2d 184, 186-87 (Fla. Dist. Ct. App. 2006), which held that the admission of an expert's analysis of DNA found on a rape kit collected by an unavailable SANE nurse did not violate the defendant's Confrontation Clause right. But *Fencher* was decided before the Supreme Court had considered the Confrontation Clause implications of scientific evidence and expert testimony in *Melendez-Diaz*, *Bullcoming*, and *Williams*. Moreover, *Fencher*'s holding is based on the rationale that the SANE nurse "merely procured the samples[;]" while others secured a chain of custody and provided the basis for the expert's conclusion that Defendant's DNA was found on the victim. 931 So. 2d at 187. *Bullcoming* expressly rejects this rationale; the

14

SANE nurse who collects samples, like a police officer who notes the speed of a car using a radar gun or a technician who operates a gas chromatograph machine, is not a "mere scrivener." 564 U.S. at ___, 131 S. Ct. at 2714.

**CONCLUSION**

**{42}**     The relevance and admissibility of Ms. Williams' expert testimony that Defendant's DNA was found on P.W. is based entirely on her reliance on testimonial hearsay identifying P.W., and locations of her body, as the source of evidence collected upon the swabs Ms. Williams later tested. Because the declarant of those statements—SANE Vandiver—is unavailable to testify, allowing Ms. Williams to offer her opinion to the jury would violate Defendant's rights under the Confrontation Clause of the Sixth Amendment. We therefore affirm the district court's order granting Defendant's motion to suppress evidence. The case is remanded to the district court for further proceedings.

**{43}     IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**LINDA M. VANZI, Judge**

15