STATE V. MARTINEZ

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**STATE OF NEW MEXICO,**
**Plaintiff-Appellee,**
**v.**
**PETER MARTINEZ,**
**Defendant-Appellant.**

Docket No. A-1-CA-35640
COURT OF APPEALS OF NEW MEXICO
May 15, 2019

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY, Briana H. Zamora, District Judge

**COUNSEL**

Hector H. Balderas, Attorney General, Santa Fe, NM, Laurie K. Blevins, Assistant Attorney General, Albuquerque, NM for Appellee

L. Helen Bennett, P.C., L. Helen Bennett, Albuquerque, NM for Appellant.

**JUDGES**

KRISTINA BOGARDUS, Judge. WE CONCUR: J. MILES HANISEE, Judge, ZACHARY A. IVES, Judge

**AUTHOR:** KRISTINA BOGARDUS

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}** Defendant Peter Martinez appeals his conviction, following a jury trial, of criminal sexual contact of a minor (child 13-18) (person and position of authority). Defendant contends that (1) the district court deprived him of his Sixth Amendment right to confront witnesses by admitting the results of DNA testing without the testimony of the police officer who collected samples of Defendant's DNA; and (2) there was insufficient evidence to support Defendant's conviction based on his alleged status as a "person in

position of authority." Because we agree with Defendant's first argument, we reverse without reaching the merits of his second.

**BACKGROUND**

**{2}**     The events leading to Defendant's charges began on New Year's Eve of 2010. Defendant's sister, Rachel, asked Defendant to watch her fifteen-year-old daughter, D.H., that evening. Rachel was scheduled to work the night shift and felt uncomfortable leaving D.H. home alone. Defendant agreed to the request, and Rachel dropped D.H. off at Defendant's apartment.

**{3}**     D.H. testified at trial as follows. Soon after her mother left, D.H. asked Defendant for liquor. Because he had only beer and she wanted a stronger drink, the two went to a grocery store, where Defendant bought rum with money D.H. gave him. After returning to the apartment, D.H. started to drink heavily. Eventually, she fell asleep. The next thing she remembered was waking up on the couch, clothed in pajamas, with Defendant positioned over her. Defendant's mouth was on D.H.'s breasts, which he was also caressing with his hands. She asked Defendant what he was doing, and he immediately got up and walked away. The following morning, D.H. left Defendant's apartment and proceeded to a nearby street corner to wait for her mother, who arrived shortly thereafter.

**{4}**     By then, police had been called to the scene. The first officer to arrive arrested Defendant and placed him in the back of a patrol unit. Another officer arrived minutes later and spoke with D.H. D.H. then proceeded directly to a sexual assault nurse examiner's (SANE) office for an examination.

**{5}**     The SANE who examined D.H. testified at trial that she had swabbed D.H. with Q-tips in various places of her body—including the inside of her cheek, her breasts, and her genitals—to collect DNA samples. The SANE also testified that she packaged the Q-tip swabs in envelopes, sealed the envelopes, and tagged the envelopes into evidence.

**{6}**     A DNA analyst from the Albuquerque Police Department (APD) crime lab testified at trial as follows. Through her analysis of the evidence collected by the SANE, the DNA analyst determined that there was no sperm or semen on the vaginal swab, but that there was saliva on the nipple and breast swabs. The DNA analyst found DNA from two individuals, one of whom she identified as D.H., on the nipple and breast swabs. Later, the DNA analyst received a DNA sample on a swab labeled as taken from Defendant. She compared the DNA from that sample to the DNA of the then-unknown second individual. They matched.

**{7}**     One week before trial was scheduled to begin, the State added Officer Chad Stuart of the APD Criminalistics Unit to its witness list. The State identified Officer Stuart as the person who collected a sample of Defendant's DNA with a buccal swab and who tagged the swab into evidence. Officer Stuart had been left off the original witness list in

error. The district court excluded Officer Stuart's testimony because the State's disclosure of him was untimely.

**{8}** During trial, and based on the fact that Officer Stuart would not be permitted to testify, Defendant asked that the court (1) suppress testimony about the DNA sample purportedly taken from him by Officer Stuart, or, at least, its connection to Defendant; and (2) bar the DNA analyst, whom the State planned to call as a witness, from testifying. Outside the presence of the jury, Defendant argued that the DNA analyst could not testify to the proper collection or preservation of the sample Officer Stuart collected, and, thus, a complete chain of custody could not be established. Given Officer Stuart's court-ordered absence as a witness, Defendant argued, allowing testimony about a sample Officer Stuart collected would violate Defendant's confrontation right.

**{9}** The State countered that Defendant's confrontation right was not at issue. Rather, the State argued, the question was one of admissibility related to the chain of custody associated with the sample collected from Defendant and, accordingly, could be resolved by the district court in its discretion.

**{10}** Agreeing with the State that the guiding consideration was not one of confrontation but instead was a "foundational" question relating to the "chain of custody[,]" the district court, still outside the presence of the jury, heard testimony from the DNA analyst about her handling of the samples collected by the SANE. The court found that the State sufficiently established a chain of custody of the sample Officer Stuart collected. At trial, the DNA analyst was allowed to testify about the SANE-collected DNA sample and the results of her DNA analysis, which necessarily consisted of a comparison to the sample Officer Stuart collected.

## DISCUSSION

### I. We Decline to Overrule *State v. Carmona*, 2016-NMCA-050, 371 P.3d 1056

**{11}** On appeal, Defendant maintains that his confrontation right was violated by the admission of testimony about the DNA sample Officer Stuart collected. Defendant's argument is premised on his assertions that Officer Stuart was a witness against him and that Defendant had no opportunity to confront him. Defendant relies largely on *Carmona,* which we decided after his judgment was entered and which interpreted recent Confrontation Clause precedent from the United States Supreme Court and our Supreme Court.

**{12}** In response, the State concedes that *Carmona* applies and acknowledges that following it would require reversal of Defendant's conviction. The State then asks this Court to depart from *Carmona*. The State cites *State v. Pieri*, 2009-NMSC-019, 146 N.M. 155, 207 P.3d 1132, which sets forth the four factors that an appellate court must consider when deciding whether to overturn precedent. Those factors are:

1) whether the precedent is so unworkable as to be intolerable; 2) whether parties justifiably relied on the precedent so that reversing it would create an undue hardship; 3) whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine; and 4) whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification.

*Id.* ¶ 21 (internal quotation marks and citations omitted). The State then asserts that *Carmona* has created an unworkable rule, as contemplated by the first factor.

**{13}** The principle of stare decisis weighs against overturning *Carmona*. Stare decisis "dictates adherence to precedent" to "promote[] the evenhanded, predictable, and consistent development of legal principles, foster[] reliance on judicial decisions, and contribute[] to the actual and perceived integrity of the judicial process." *Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 7, 133 N.M. 661, 68 P.3d 901 (internal quotation marks and citation omitted). Stare decisis "lies at the very core of the judicial process of interpreting and announcing law." *Id.* (internal quotation marks and citation omitted). Accordingly, we require a "compelling" reason to overrule a case. *Id.* The State offers no such compelling reason.

**{14}** The State criticizes *Carmona*'s rationale, but the *Pieri* factors do not prompt us to consider the quality of reasoning underlying *Carmona*. *See Pieri*, 2009-NMSC-019, ¶ 21. Instead, we may consider whether precedent is "unworkable," which differs from "badly reasoned." *Id.*; *see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (distinguishing "unworkable" from "badly reasoned" in stating that the court will consider abandoning precedent when "governing decisions are unworkable *or* are badly reasoned" (emphasis added)).

**{15}** Even assuming that poor reasoning alone was cause to overturn our precedent, we would not overturn *Carmona* on that basis, because we remain confident in its reasoning. We arrived at our holding in *Carmona* through an extensive review of the United States Supreme Court's recent Confrontation Clause cases and of our Supreme Court's distillation of those cases. *See Carmona*, 2016-NMCA-050, ¶ 13 (noting that "[o]ur analysis of modern Confrontation Clause jurisprudence points squarely" to our conclusion). We decided *Carmona* unanimously, and our Supreme Court declined to review it. *See id.*, *cert. denied*, 2016-NMCERT-___ (No. S-1-SC-35851, May 11, 2016). We are not aware of any authority that undermines the reasoning of *Carmona*, which we continue to believe is sound.

**{16}** To the extent the State supports its assertion with claims of inconsistency between *Carmona* and other cases interpreting the Confrontation Clause, we are not persuaded that such inconsistency exists and, even if we assume it did, that such inconsistency rises to the level of intolerability. The State cites cases that predate the more-recent jurisprudence *Carmona* relied on and cases with facts distinguishable from *Carmona*'s. We decline to overrule binding precedent based on such authority. More to

the point, however, the State has acknowledged that *Carmona* squarely controls, and, in so doing, confirms that our law is clear on the Confrontation Clause issue in this appeal. The State has not persuaded us that *Carmona* is unworkable. We therefore uphold *Carmona*, which we use to guide our analysis of Defendant's Confrontation Clause argument.

## II. Defendant's Confrontation Right Was Violated

**{17}** We turn next to Defendant's contention that his confrontation right was violated, which we review de novo. *State v. Massengill*, 2003-NMCA-024, ¶ 5, 133 N.M. 263, 62 P.3d 354.

**{18}** The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The right is triggered only when such a witness's statement constitutes testimonial hearsay. *See Carmona*, 2016-NMCA-050, ¶ 15, (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004) (recognizing that the Clause is limited to witnesses who bear out-of-court, "testimonial" statements)). A statement is testimonial "if the declarant made [it] primarily intending to establish some fact with the understanding that the statement may be used in a criminal prosecution." *State v. Navarette*, 2013-NMSC-003, ¶ 8, 294 P.3d 435. Moreover, "the Confrontation Clause is violated only if the testimonial statement is offered to prove the truth of the matters asserted." *Id.* ¶ 12. Lastly,

> an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted. Therefore, the declarant must testify at trial and be subject to cross-examination, or alternatively must be unavailable, and the defendant must have had a prior opportunity to cross-examine the declarant.

*Id.* ¶ 13.

**{19}** Interpreting these principles and others, we concluded in *Carmona* that "the Confrontation Clause prohibits the admission of DNA evidence collected by an unavailable SANE and any expert testimony based thereon when the primary purpose animating the SANE's collection of such evidence is to assist in the prosecution of an individual identified at the time of the collection." 2016-NMCA-050, ¶ 13. We therefore affirmed the district court's suppression of the DNA evidence.

**{20}** *Carmona* controls the outcome of this case, as the State concedes. At trial the State sought to prove that Officer Stuart collected the sample of Defendant's DNA; the collection was for the purpose of establishing a fact for use in the criminal prosecution against Defendant. Thus, Officer Stuart was a witness against the accused, and the statement he would have made at trial—that he took a DNA sample from Defendant and sent it to the crime lab—was testimonial. Officer Stuart's statement would have been offered to prove the truth of a matter asserted: that the swab he used to collect

Defendant's DNA was the same swab the DNA analyst received from the APD Criminalistics Unit and relied on as the basis for her opinion. Officer Stuart, the declarant of a testimonial statement, did not testify at Defendant's trial. His absence made the DNA analyst's statement—that Defendant was the source of the DNA sample collected by Officer Stuart—hearsay. Because Defendant had no opportunity to cross-examine a witness whose statement against him was testimonial, Defendant's confrontation right was violated. *See Navarette*, 2013-NMSC-003, ¶ 7 ("[A]n out-of-court statement that is both testimonial and offered to prove the truth of the matter asserted may not be admitted unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant."); *see also Carmona*, 2016-NMCA-050, ¶ 42.

**{21}** The facts in this case closely track those in *Carmona*. The primary difference is that here, it was the officer who collected the DNA sample from the accused—not the SANE who collected DNA samples from the alleged victim—who was unavailable at trial. We do not recognize in that distinction anything that would call for a different interpretation of the applicable law. In both cases, the State planned to or did call a DNA analyst to testify that one of the matching samples came from a particular source, but the witness who collected the sample from the source was unavailable to testify. Like the accused in *Carmona*, Defendant had a constitutional rig0ht to confront the witness collecting the sample. *See Carmona*, 2016-NMCA-050, ¶ 42.

**{22}** Because the DNA evidence was admitted in violation of Defendant's confrontation right, we next consider whether admission of this evidence was harmless.

### III.    Admission of the DNA Evidence Was Not Harmless

**{23}** A violation of the Confrontation Clause, by itself, is not sufficient to require a new trial. *State v. Schwartz*, 2014-NMCA-066, ¶ 15, 327 P.3d. 1108. A new trial is required only if the improperly admitted evidence harmed the defendant. *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. "The [s]tate bears the burden of demonstrating that the error was harmless." *Schwartz*, 2014-NMCA-066, ¶ 15. A constitutional error is harmless only "when there is no reasonable possibility it affected the verdict." *Tollardo*, 2012-NMSC-008, ¶ 36 (emphasis, internal quotation marks, and citation omitted).

**{24}** In order to determine whether admission of the DNA evidence was harmless error, we must review "the error itself, including the source of the error and the emphasis placed on the error at trial." *Schwartz*, 2014-NMCA-066, ¶ 16. We also must look at other evidence of guilt, not to determine whether there was sufficient evidence to convict the defendant, "but to evaluate what role the error played at trial." *Id.* (internal quotation marks and citation omitted). We may also consider "the importance of the erroneously admitted evidence in the prosecution's case, as well as whether the error was cumulative or instead introduced new facts." *Id.*

**{25}** Although the State does not argue that the error was harmless, we briefly review the evidence introduced to determine whether there was "no reasonable possibility" that

the erroneous introduction of the DNA evidence affected the verdict. *Tollardo*, 2012-NMSC-008, ¶ 36 (emphasis, internal quotation marks and citation omitted). At trial, D.H. testified about what happened, including that when she woke up, Defendant's mouth was on her breast and he was caressing her breasts with his hands. D.H.'s credibility was the central issue at trial, and the DNA evidence corroborated her testimony. Although the State called other witnesses whose testimony was consistent with or reinforced D.H.'s version of events, none directly witnessed the alleged sexual contact, and therefore the DNA evidence was an important piece of objective, scientific evidence that collaborated D.H.'s claim that Defendant had improperly touched her.

**{26}** The State's heavy reliance on the DNA evidence and its multiple references to it in opening and closing arguments further confirm how important the DNA evidence was to proving its case. *See State v. Leyba*, 2012-NMSC-037, ¶ 30, 289 P.3d 1215 (noting that the state's reliance on improperly admitted diary, including the repetitive manner in which the state referred to the diary during closing argument, strongly suggest how useful such evidence was). The State told the jury in its opening statement that it would hear DNA evidence of a match "for [D]efendant's saliva" from swabs of D.H.'s nipples. The State's final witness, the DNA analyst, testified at length about the DNA testing she performed. In its closing argument, the State mentioned the DNA evidence numerous times, telling the jury that the evidence proved that Defendant touched D.H.'s breast, and the State referred again to the "scientific evidence" when it acknowledged that D.H. had previously made false sexual molestation claims. In its rebuttal, the State characterized the DNA evidence as "rare scientific . . . evidence . . . important scientific evidence," and closed its argument by stating that D.H. "isn't crying wolf here. . . because of the [DNA] evidence left behind" by Defendant.

**{27}** The erroneously admitted DNA evidence played a key role in the State's case, because it tied Defendant to the very acts D.H. described and bolstered her credibility. Because there is no reasonable possibility that this evidence did not contribute to Defendant's conviction, its introduction was not harmless. *See Schwartz*, 2014-NMCA-066, ¶ 27 (examining the central role of DNA evidence to the state's case to conclude that violation of the defendant's confrontation right was not harmless). Under the circumstances, we conclude that admission of the DNA evidence was not harmless error.

## CONCLUSION

**{28}** We reverse Defendant's conviction and remand for a new trial.

**{29}** **IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**ZACHARY A. IVES, Judge**